HARRY SHERMAN, as President of the Moving Picture Machine Operators Union, Local 306, etc., Plaintiff, v. ARTHUR ABELES and Others, Defendants.*

Supreme Court, New York County, January 2, 1934.

* Affd., 241 App. Div. ——. See *Edwards* v. *New York Edison Co.* (149 Misc. 722).

• *S. M. Birnbaum* and *Copal Mintz*, for the plaintiff.

*Weisman, Quinn, Allan & Spett*, for the defendant Association.

*Joseph A. Teperson*, for the defendant Allied Motion Picture Operators Union.

*Kelly & Connelly*, for the defendant Springer.

COLLINS, J. This motion for an injunction *pendente lite* presents a contest between rival labor unions and a contention between one of those unions and a cluster of employers.

The plaintiff is Moving Picture Machine Operators Union, Local 306, of International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, a voluntary association of more than seven persons. (It will be referred to hereinafter as Local 306.) This local and its former competitor, but now ally, Empire State Motion Picture Operators Union, Inc. (hereinafter called Empire), dominate the motion picture projectionists' craft in Greater New York. Local 306 comprises about 1,800 members, and Empire approximately 500. In addition there are a great number of non-union projectionists in New York. Local 306 is affiliated with the American Federation of Labor.

The defendant Independent Theatre Owners Association, Inc. (designated the Association), is a group of motion picture theatre proprietors, operating or controlling (according to plaintiff) 420, or (taking defendants' count) 360 motion picture theatres in Greater New York.

The Association came into being in May, 1933. Thereafter the defendant Allied Motion Picture Operators Union, Inc. (herein called Allied), was created. Allied is the rival union to Local 306 and Empire. The remaining defendants are motion picture theatre proprietors.

Dissatisfied with Local 306 and Empire, the Association, on August 21, 1933, entered into a ten-year contract with Allied, whereunder Allied projectionists exclusively were to be employed in the theatres of the Association members. In about a dozen Association theatres projectionists holding membership in Local 306 were discharged before the expiration of their contracts (defendants, however, insisting that they were paid for the balance of the respective terms). In some instances they were supplanted by Allied projectionists, and in other instances there were no replacements. In the latter cases the result was to diminish the number of projectionists employed. Wages of the substituted projectionists were lowered from those theretofore received by members of Local 306 and their working hours were lengthened.

Thus, Local 306 and Allied, and Local 306 and Association, have launched a labor war. The contest has become acrimonious. Admittedly, the confederation of Association and Allied aims at the extermination of Local 306 and Empire; admittedly, too, Local 306 and Empire aspire to crush and supplant Allied. The struggle

is for supremacy; the prize, domination. This court is called upon to lend its assistance.

Local 306 charges Allied with being a pseudo, or " company union," created by Association to wreck Local 306 and Empire. It assails the agreement between Association and Allied as monopolistic, designed to disrupt contractual relations between Local 306 and Empire projectionists and members of Association; it asserts that Association and Allied have conspired to wreak doom upon Local 306 by boycotting Local 306 projectionists, and that the effect of the conspiracy constitutes a violation not only of established legal principles but of the President's Re-employment Agreement (PRA), the National Recovery Act (NRA), the Moving Picture Industry Code (the Code), and chapter 781 of the Laws of 1933 (Extraordinary Session) of the State of New York (the State act in aid of NRA).

The complaint demands a more comprehensive judgment than is requested on this motion. The temporary relief now sought is " that the defendants be required to observe the applicable provisions of the Code and restore to their jobs the projectionists who have been discharged in violation of the National Recovery Act and pursuant to the unlawful conspiracy charged in the complaint."

The defendants stoutly deny the plaintiff's charges. They point to the litigious record of Local 306 and Empire and to the nefarious, if not criminal, record of Local 306's deposed leader. The Association denies that it dominates Allied; Allied disavows obeisance to Association. The defendants counter by charging the plaintiff with aspirations to control the projectionist craft, to the detriment of the motion picture theatre industry, as well as to the harm of the vast majority of projectionists. Not only is the indictment of transgressing the above laws traversed, but the defendants insist that the State court is not invested with jurisdiction over the PRA, the NRA or the Code. Further opposing the motion, defendants advance the objection that the Code has not been filed with the Secretary of State of New York as provided in section 2 of chapter 781 of the Laws of 1933, and that, hence, the terms of the Code are not enforcible by the State court. Finally, the defendants urge that even if there be jurisdiction, the equities here do not call for its exercise.

There will be examined:

*First.* Whether the record of Local 306 precludes it from obtaining relief in equity.

*Second.* Whether the papers before the court reveal such a conspiracy as justifies the intervention of equity.

*Third.* (a) Whether the record exposes a violation of the PRA, the NRA, or the Code. If so, (b) whether this court may take

cognizance thereof and grant appropriate relief, and, (c) whether the plaintiff may invoke the provisions of the Federal legislation without joining as parties any of the government's enforcing officers, and despite the non-filing of the Code with the Secretary of the State of New York as provided by section 2 of chapter 781 of the Laws of New York of 1933.

*First.* The opposing papers excoriate the litigious record of Local 306 and Empire and villify their captains.

It is most unfortunate for the projectionists that contentions within their organizations have weakened their prestige, depreciated their vitality, deplenished their treasuries, lessened their bargaining power and alienated public confidence. Unluckily, too, that workers should imitate those whose oppressive and ruthless methods gave birth to labor unions. Some of the leaders in the fight against industrial tyranny themselves became tyrants; despoilers, instead of promoters, of the true principles of unionism.

And it is distressing that the members were not earlier adequately aroused to their own necessities and to the realization that laceration, if not complete demolition would be wrought by a continuance of such tactics. Time and time again the courts have been resorted to for the application of the fumigation process — a process which should have been self-applied. Injunction after injunction has issued to force open the windows of Local 306 so that the stench might escape and the fresh air enter.

But those presently intrusted with the management of Local 306 proclaim the termination of the baneful, if not criminal, activities of the Kaplan regime, and announce the pursuit henceforth of lawful and ethical policies.

Regarding this element of the case, I conclude that if Local 306 is right in the present controversy, the fact that it has been adjudged wrong in others should not work a forfeiture of the enforcement and protection of the right.

*Second.* Does the record exhibit a conspiracy which calls for a temporary injunction?

The general policy of the law respecting the internal affairs of labor unions is that of non-interference. Generally it is impolitic for the courts to attempt to regulate labor unions, to take sides concerning their internal dissensions, or to dictate the policies they are to pursue, or the manner of their pursuit. The law's attitude of according unions liberty to compose their differences best comports with the ideals of a free government.

Only when there has been a transgression or a threatened transgression of the law have the courts intervened, and then, reluctantly.

Unfortunately — unfortunate for capital, for labor and for the

public — the occasions have been many when the law has found its intervention compulsory. Such intervention has fashioned certain legal principles, the application of which is here summoned.

Section 1(a) of article III of the Code, adopted December 7, 1933 (formerly part of 7a of the NRA), is the worker's charter of liberty. It declares: " Employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

It is charged that Allied is a " company union."

Whatever sanction may have been given " company unions " by the decision in *Interborough Rapid Transit Co.* v. *Lavin* (247 N. Y. 65), we are now faced with the unmistakable policy declared in section 7a of the NRA, viz.: " No employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing or assisting a labor organization of his own choosing." This provision was carried into the Code as subdivision (b) of section 1, article III.

Is Allied a " company union?" The attorney for Association had a. hand in Allied's formation. Another attorney who has acted for Allied is a son of the former business manager of Association. Allied's dues were collected through or at the offices of the Association. For a period, Allied's offices were at the premises occupied by Association. The recording secretary of Allied is a brother of the president of Association. The chief officers of Allied are, or were, Empire members.

This closeness of Allied to Association is further evidenced by the ten-year contract between the two. Association is to employ only Allied members, " subject and subordinate, however, to any existing labor contracts between the members of the Association and any other motion picture operators' union, but not to any renewals thereof." (¶ 1.) Association agrees to comply with the constitution and by-laws of Allied. (¶ 3.) Allied is forbidden during the existence of the agreement to " consolidate or associate with any other labor organization unless consented to in writing by the Association, nor shall it disband or do or omit the doing of any act which will cause its existence to come to an end, without the written consent of the Association, anything contained in the by-laws of the Allied to the contrary notwithstanding." (¶ 16.) Thus, Allied may not consolidate with Local 306 or Empire, or with any other labor organization; it may not affiliate itself with the American

Federation of Labor; nor may it cease to exist — unless, of course, Association consents in writing thereto. Allied agrees not to enter into any combination or association hostile to or whose purpose shall be to injure the members of the Association or their property and " shall not permit picketing of the members' theatres by Allied members, and shall not be a party to any act hostile to them, or any of them." (¶ 17.) For a violation of any of the provisions of paragraphs 16 and 17 the Association has the right, on giving ten days' written notice, to terminate the contract. (¶ 18.) Moreover, " in the event that any other motion picture operators' union shall picket any theatre owned, operated or controlled by a member of the Association, then and in that event and for the protection of the members of the Association and the members of the Allied, the Allied agrees to adopt such measures as may be reasonably necessary for the protection of the members of the Allied as well as for the protection of the members of the Association, and will take all reasonable steps to minimize the injury and damage that may be done by such picketing." (¶ 19.) Thus, Allied members pledge themselves to prevent picketing of Association theatres.

The above uncontradicted facts, supported mainly by documentary evidence, support the charge that Allied is a " company union." The liaison is boldly delineated; the rivet obtrudes.

What is far from clear from the papers before me, however, is whether one seeking employment from members of Association has been required " as a condition of employment " to join Allied, or " to refrain from joining, organizing or assisting a labor organization of his own choosing." The defendants assert that there are approximately 1,100 theatres in the metropolitan area; that Allied has only 180 members, while Local 306 has 1,800, and Empire about 500, and that there remain between 4,000 and 5,000 non-union projectionists in New York. Further, that Association employs " all four types of projectionists, to wit: members of Local 306, members of Allied, members of Empire and nonunion projectionists."

Although color is lent to the charge of exacting fealty to a " company union " as a condition to employment, the color is not so fast as to warrant the issuance of a temporary injunction on clashing affidavits. The issue is too significant and not so free from doubt as to be struck off on affidavits representing such a cleavage. (*Elk Street Market Corporation* v. *Rothenberg*, 233 App. Div. 243; *Morrin* v. *Structural Steel Board of Trade*, 231 id. 673.)

This conclusion applies with like strength to the charges of conspiracy and the discharge of Local 306 projectionists by Association members in violation of existing contracts. The rights and obligations of the respective parties concerning these issues are not so

finely etched as to enable a just decision respecting them on conflicting affidavits. It cannot be determined from these affidavits whether the agreement here complained of is " of an oppressive nature operating generally throughout the community to prevent craftsmen in the trade from obtaining employment and earning their livelihood " and whether the agreement is participated in by all or by a large proportion of employers in the community. (*McCord* v. *Thompson-Starrett Co.*, 129 App. Div. 130; affd., 198 N. Y. 587.) Indubitably, " employers may not combine and agree to employ either only union or non-union labor when such employers control the trade in any community or control it to such an extent that it would be practically impossible for those thus discriminated against to obtain employment, for in such case the agreement would be oppressive and contrary to public policy." (*Grassi Contracting Co.* v. *Bennett*, 174 App. Div. 244, 249, 250.)

The wide cleavage between the affidavits of the respective contestants is illustrated by the plaintiff's assertion that " the total number of moving picture theatres in New York City is 624," and that, accordingly, the Association " is composed of 59% of the theatres," whilst the defendants maintain that the number of theatres in the metropolitan area is 1,100. Patently, these issues should not be pre-tried on divergent affidavits. The problem of directing the restoration of discharged projectionists must await the trial.

*Third.* (a) When the third phase of the motion is approached, viz., whether there has been a violation of the PRA, the NRA or the Code, the papers are not so shadowy.

Although the contract between the Association and Allied is annexed to the opposing papers, and although that contract refers to the schedule of wages paid Allied members by Association members, the schedule is not subjoined. However, the evidence is quite convincing that, as to wages and hours, there has been a violation of the PRA, the NRA and the Code.

Under the PRA, to which Association became a party, Association pledged itself that between August 1 and December 31, 1933 (the period of the President's Emergency Re-employment Drive), it would not employ any worker more than a maximum week of thirty-five hours with a right to work a maximum week of forty hours within a week, and not to employ any worker more than eight hours in any one day. Further, " Not to reduce the compensation for employment now in excess of the minimum wages hereby agreed to * * * and to increase the pay for such employment by an equitable readjustment of all pay schedules." (PRA, § 7.) Under section 7a of the NRA, Association members became obli-

gated "to comply with the maximum hours of labor, minimum rates of pay, and other conditions of employment, approved or prescribed by the President." Under the Code (Art. IV, part 1, §§ 2, 6, 7) the work week was to consist of forty hours, and motion picture machine operators "who are directly and regularly employed by the Exhibitors, shall receive not less than the minimum wage and work no longer than the maximum number of hours per week which were in force as of August 23, 1933, as the prevailing scale of wages and maximum number of hours of labor by organizations of any of such employees affiliated with the American Federation of Labor with respect to their respective type of work in a particular class of theatre or theatres in a particular location in a particular community, and such scales and hours of labor with respect to any of such employees in such community shall be deemed to be, and hereby are declared to be, the minimum scale of wages and maximum number of hours with respect to all of such employees in such communities in such class of theatre or theatres." Further: "In no event shall the duties of any of the employees hereinabove specified in Section 6 (a) directly and regularly employed by the Exhibitors as of August 23, 1933, be increased so as to decrease the number of such employees employed in any theatre or theatres in any community, except by mutual consent."

Despite these provisions the evidence is persuasive that members of Association are having their booths operated by projectionists less in number than were employed on August 23, 1933; that these projectionists are working longer than the maximum number of hours in force as of that date, under contracts with Local 306 (this local being the organization of projectionists "affiliated with the American Federation of Labor"), and that the pay of these projectionists has been reduced beyond that in force as of that date, under contracts with Local 306.

Although the president of Association avows: "Maximum hours of labor and minimum wages have been set which bind the members of I. T. O. A. [Association] and which they most certainly will implicitly obey," the opposing papers are vague in substantiation of the claim of obedience. On the contrary, the evidence sustains the plaintiff's charge that projectionists are being worked fifty-two instead of forty hours a week; that wages have been reduced and that projectionists have been discharged and that their positions remain unfilled.

The defense that the provisions of the PRA and NRA terminated with the adoption of the Code is of no avail, because, as has been sketched, the provisions of the Code and those of the NRA and PRA are substantially identical, with the exception that the hours

for projectionists were lengthened from thirty-five to forty. The criterion as to wages and hours is not the contract between Association and Allied but the wages and hours of members of Local 306 on August 23, 1933.

(b) Violations having been shown, may this court take cognizance of them and grant appropriate relief?

The defendants insist that only the Federal court or the Compliance Board may assume jurisdiction over violations. In support there is cited *State of Texas* v. *Standard Oil Co.*, not officially reported, where it was said that the act is to be enforced " in the several District Courts of the United States." Also *Purvis* v. *Bazemore,* decided in the District Court of the United States for the Southern District of Florida, December 2, 1933, which holds " that actions to restrain violations of the National Industrial Recovery Act should be brought by the United States acting through its District Attorneys and not by any individual members of an industry, and the District Attorney is not movant here, but persons engaged in the same industry are complainants, and 1 do not believe that they have any standing in Court to ask for an injunction under the National Industrial Recovery Act."

It is not necessary to express dissent from these holdings because of the emphatic provisions of chapter 781 of the Laws of New York of 1933, which is the official recognition of this State not only to the spirit but to the letter of the NRA. Thus, in section 1: " It is hereby declared to be the policy of this state to cooperate in the furtherance of the objects and purposes declared in said act of the congress, and each and every provision of this act shall be construed in accordance with the policy so declared, and to make uniform the standards of fair competition prevailing in intrastate commerce and industry with those of interstate commerce required by the provisions of the said national industrial recovery act which are applicable in interstate commerce in the state of New York."

The co-operation which this State extends to the Federal government, by chapter 781, is more than the mere passage of a resolution pledging allegiance to the Federal program. That chapter 781 is more vital than a " me too " ceremony, more than an " amen " acquiescence, appears from section 3 of the chapter: " The supreme court of the state of New York is hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition, agreement, license, rule or regulation, filed pursuant to this act, and to prevent and restrain the commission within this state of any act tending to defeat or hamper the operation and effectiveness, within the state, of such act of the congress [NRA] at the instance

of any party whose interests are or may be adversely affected by such violations or acts."

Section 3 dispels any doubt as to the jurisdiction of this court.

(c) Are members of Local 306 parties "whose interests are or may be adversely affected by such violations or acts?"

The answer is in the question. That the conduct of Association members in lowering the wages and increasing the working hours of its projectionists adversely affects members of Local 306 is as self-evident as the truism that the strength of a chain is adversely affected by a weakened link.

If the President's program is to be vitalized and efficacious, if it is to be more than a rostrum entreaty, then all who come within its purview must adhere to its mandates. The Code seeks to invest the recovery program not only with lips, but with a heart and a conscience and a long strong arm to bludgeon — with legal process if need be — the timid, the recalcitrant, the shirker and the dodger. The President defined his Re-employment Agreement as "part of a nation-wide plan to raise wages, create employment, and thus increase purchasing power and restore business." Paragraph 8 of the PRA contained the pledge that the subscribers thereto (including Association) were "not to use any subterfuge to frustrate the spirit and intent of this agreement which is, among other things, to increase employment by a universal covenant, to remove obstructions to commerce, and to shorten hours and to raise wages for the shorter week to a living basis."

These laudable and expedient agenda cannot be accelerated or achieved by the simple process of subscribing to codes. Unless the program is made to work, it will remain a program — impotent and dispirited and unavailing. Polemics alone will conduce to nothing but the accumulation of verbiage. The word must become the deed. And the deed — if need be — must be compelled.

Defendants urge that since the moving papers do not reveal that the Code has been filed pursuant to section 2 of chapter 781, the State court is without jurisdiction to enforce its provisions.

I do not regard the omission as fatal to jurisdiction.

I construe the second part of the above quotation from section 3 as separable from the first. That is to say, that "the supreme court of the state of New York is hereby invested with jurisdiction * * * to prevent and restrain the commission within this state of any act tending to defeat or hamper the operation and effectiveness, within the state, of such act of the congress at the instance of any party whose interests are or may be adversely affected by such violations or acts." More, the expression "violations or acts" differentiates violations of the Code from acts "tending to defeat

or hamper the operation and effectiveness, within the state, of such act of the congress." Certainly the acts here complained of, if proved, tend " to defeat or hamper the operation and effectiveness, within the state, of such act of the congress." The underselling of labor can just as adversely affect the interests of other craftsmen in the industry as the underselling of commodities adversely affects the interests of others in like business who are unable to cope with the competition.

Again, it is not disputed that, in some instances, members of Local 306 were discharged and Allied members substituted. That the interests of the discharged unionists were and· are thereby adversely affected, is palpable beyond controversy.

Because of the freshness of the law involved, interpretative cases are sparse and negligible. But the law itself·is unclouded; its intent and design is undimmed. Hence, precedents are not indispensable. By analogy, however, are many examples of sustained actions in behalf of those adversely affected by laws for the benefit of a class or the public or the community. (*Willy* v. *Mulledy*, 78 N. Y. 310; *Amberg* v. *Kinley*, 214 id. 531; *Rourke* v. *Elk Drug Co.*, 175 App. Div. 145; *Seaver* .v. *Ranson*, 224 N. Y. 233; *Pond* v. *New Rochelle Water Co.*, 183 id. 330; *Farnsworth* v. *Boro Oil & Gas Co.*, 216 id. 40; *Matter of International Railway Co.* v. *Rann*, 224 id. 83; *Strong* v. *American Fence Construction Co.*, 245 id. 48.) The right to seek redress extends to all whom there was a purpose to protect. (*DeCaprio* v. *New York Central R. R. Co.*, 231 N. Y. 94, 97.) But these illustrations are fortifications, not reliances. The pivotal and decisive factor is the unequivocal language of the law itself; it means what it says.

Considering chapter 781 as a whole, and viewing its setting, it is obvious that it was intended to lend the co-operation of the machinery of the State, including the judiciary, to the consummation of the recovery program. As was the aim of the Federal legislation, so this State enactment is designed to encompass those whose patriotism is reflected in their speech but not in their payrolls.

Idealistically, of course, employer and employee should, without the suggestion or constraint ·of the law, heed the emergency's demands for the elimination of strife. But the enactment of the legislation under consideration attests the ever-presence of human frailties. When aggrandizement or callousness or inertia induces industrial warfare, the law intrudes to remind the belligerents that not only *their* interests, but those of the *mass*, impel a cessation of hostilities. This new process of intervention may constitute an innovation. But other branches of the government have

decreed that the unpatterned times call for innovation, if not experiment.

And if this great experiment for the banishment of want and the restoration of security is to yield results, the sustenance which has been provided for its maintenance must not be withheld; otherwise the experiment will be stricken before maturity. The public good clarionly calls forth the powers of the courts. The response must meet the need; the relief must equal the necessities.

The economics of the case cannot be entangled with the legal principles implicated. Another forum has determined the reasonableness of the provisions now claimed to have been offended. If abiding thereby will produce ruin or operate unfairly, application for relief or modification must be addressed to the proper Federal authorities. Association members are parties to the Code; the debate affecting it ended with the Code's adoption. Inevitably, individual examples of injustice will occur. Necessarily, however, the interests of the few must surrender to the good of the many. The Code is the law; it must be obeyed.

Considering all the facts before me and enforcing the applicable provisions of the Code, as authorized by section 3 of chapter 781 of the Laws of 1933, the motion is granted to the following extent:

Restraining *pendente lite* Association's members:

(I) From interfering directly or indirectly with the right of their employees to organize and bargain collectively through representatives of their own choosing. Such employees shall be free from the interference, restraint, or coercion of Association's members, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

(II) From requiring, directly or indirectly, any employee or one seeking employment, as a condition of employment, to join any company union or to refrain from joining, organizing or assisting a labor organization of his own choosing, and

(III) From violating, directly or indirectly, the provisions of the Code or amendments thereto, or modifications thereof, respecting the maximum hours of labor and minimum scale of wages, fixed for projectionists employed by Association's members.

Since the defendants maintain that they are implicitly complying with the above provisions of the Code, this temporary injunction can impose no hardships or additional obligations or fetters upon them.

The undertaking is fixed at $15,000.

Because of the importance of the issues, to speed their final determination, and to minimize any harm which the preliminary

injunction might occasion, the case is hereby set down for trial in Special Term, Part III, for Monday, January 29, 1934.

Settle order on notice.

COLLINS, J. Motion for reargument granted, and on such reargument the original decision is adhered to.

The defendants insist that in the New York community " there is no set scale of wages or hours which would automatically become operative upon the employing of a motion picture operator." But neither this court's decision nor the Code attempts to fix a scale of wages or hours. We are dealing with a *minimum* scale of wages and *maximum* hours of work. No attempt at precision or inflexibility is designed.

Defendants' contention that the Supreme Court is attempting to compete with " the mechanics of the Code for fixing wages, etc.," or that the court is endeavoring to supersede the Federal authorities, is untenable and manifests a misreading and misapprehension of the decision. The court does not undertake to fix wages or to prescribe working hours; what it held and holds is that the wages and hours *fixed by the Federal authorities* must be obeyed.

I am not impressed by the protest of Allied's president against the holding that Allied is a company union. Apart from the other facts, a union which binds its members to their employers for a span of ten years not to merge or associate itself with another union, not to affiliate with the American Federation of Labor, not to dissolve, and pledges to cope with picketing by others — such a union is not free and independent and autonomous.

There can be no disagreement with the defendants' argument that a uniform policy respecting the NRA requires that controversies thereunder should be composed or adjusted by the machinery set up by the Federal government. Evidently, however, that has failed in the present case. The institution and continuance of this litigation evince a failure of that machinery to effect a settlement of the differences. The affidavit of Association's president, in support of the motion for reargument, refers to a contemplated hearing on January fourth " to discuss and attempt to settle the very difficulties which are the main thorn in the side of the plaintiffs herein, to wit, the booth scales and the hours and wages of motion picture operators. It is not beyond the realm of possibility," the affidavit proceeds, " that at such meeting, the contentions of the defendants herein with respect to maximum hours and minimum wages will be fully sustained." Exhibit " A," subjoined to that affidavit, refers to the proposed meeting and announces that " The

union and exhibitor unit have unsuccessfully attempted to set a basic booth scale for the independent houses and meetings between the two organizations have been fruitless."

The court has vainly scanned the record for the result of the meeting and sought to ascertain what the defendants themselves have done concerning arbitration. Article 4, subdivision C, part I, section 10 of the Code pledges employees and employers " to attempt to arbitrate all such disputes." This court would not only be immensely pleased if the disputes here were arbitrated, but earnestly urges arbitration upon the parties as a matter of public duty. Not only would such a consummation rid the court of the case and save the litigants time and cost, but it would conduce to the success of the recovery program. That program depends largely upon co-operation rather than forced obedience.

The defendants, however, insist that there is no dispute " between employees and employers." More, the charges and counter-charges exhibit fundamental and seemingly irreconcilable disagreement. This brings the case within the purview of chapter 781 of the Laws of 1933 and confers jurisdiction upon this court to entertain the grievance. The court has not *sought* jurisdiction; it was *compelled.*

If, as the defendants plead, they are not only not violating any of the provisions of the Code, but are, in fact, paying higher wages to the projectionists than the projectionists were receiving, and that the working hours have been reduced rather than increased, it is not easy to fathom why the defendants object so strenuously to the court's mandate that the Code be obeyed.

The defendants' objection that the Code has not been filed with the Secretary of State of the State of New York, as provided by section 2 of chapter 781, is now met by the showing that the Code was filed on December 13, 1933.

The court suggests (1) that the parties do their utmost to adjust the disputes, either among themselves or through the machinery fashioned by the Federal government, and (2) failing in such efforts, proceed with the trial at the earliest time possible.