Benjamin De Agostina, as President of the Allied Motion Picture Operators Union, Plaintiff, v. Harry Holmden, as President of the Moving Picture Machine Operators Union, Local 306, of the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada and Others, Defendants.*

Supreme Court, New York County, November 15, 1935.

* Published with permission of Mr. Justice Frankenthaler, who appointed referee to hear and determine.

*Moos, Nathan, Imbrey & Levine,* for the plaintiff.

*Phillips, Mahoney, Leibell & Fielding,* for the defendants Local 306 and Union No. 1.

*Max A. Goldhill* for the defendant Leffmeyers Corporation.

MARSH, ROBERT McC., Referee. This action arises out of the rivalry of labor unions in the field of motion picture projection. The Moving Picture Machine Operators Union, Local 306 (hereinafter referred to as " Local 306 "), is affiliated with the American Federation of Labor and has been in existence many years. The plaintiff Allied Motion Picture Operators Union (hereinafter called "Allied "), was formed in the summer of 1933, its organizers including former members of Local 306, members of another motion picture operators union known as " Empire," and men who had not theretofore belonged to any union. A few months previously a group of owners and operators of motion picture theatres scattered throughout New York city, no one owner having more than three theatres and many having only one, formed themselves into an association under the name of Independent Theatre Owners Association (hereinafter referred to as " I. T. O. A."). Motion picture exhibitors affiliated with the large producing interests were excluded from membership, and the main purpose of the organization, which

is incorporated, appears to have been the protection of the interests of the smaller exhibitors against the larger circuits and other influential powers operating in the motion picture field.

In August, 1933, a contract was entered into between Allied and I. T. O. A. by which the latter undertook on behalf of its constituent members to employ only members of Allied as motion picture operators in their respective theatres and to pay wages in accordance with an agreed schedule. The contract contained various other provisions regulating the relationship between the parties and the method of operation thereunder, and provided that it was to remain in effect for ten years, except that the wage scale was to be readjusted every two years by a board of arbitration. Separate contracts were also executed at or about the same time between Allied and the individual theatre owners, members of I. T. O. A., or at least many of them, embodying the same terms and provisions.

Pursuant to these agreements, Allied operators began to be employed about September first in the theatres of the members of I. T. O. A. In some cases they succeeded members of Local 306; in certain new or reopened theatres they had no predecessors. Where Local 306 men had been employed under contract, however, the change took place only after payment in full to the end of the contract period.

Local 306 took steps without delay to meet this challenge to its supremacy. Its higher officials made personal protest to members of I. T. O. A., and pickets were posted in front of theatres where Allied operators were employed, carrying signs and placards asking that the public withhold its patronage. Activities of this character have been more or less continuous for over two years. From time to time, however, other occurrences have taken place of a less orderly and of an even violent nature, responsibility for which has been denied by the defendant unions. In August, 1934, one member of I. T. O. A., the defendant Leffmeyers Corporation, owner of the De Luxe Theatre, having suffered severely from such occurrences, discharged its Allied operators and replaced them with men from Local 306. Thereupon Allied brought this suit for an injunction against Local 306 and certain other unions which had been co-operating in the picketing, and against the theatre owner which had broken its contract.

A judgment is asked for enjoining the defendants from all picketing, from disseminating false statements, from threatening, intimidating or assaulting Allied operators or patrons of the theatres where they are employed, from attempting to induce members of I. T. O. A. to breach their contract with the plaintiff, and for a

decree of specific performance against the theatre owner by which it has already been violated, together with other relief. The Musicians Union Local 802 and the Theatre and Amusement Employees Union Local 95, named as defendants in the summons, have not been served with process. An injunction *pendente lite* has been granted on stipulation, restraining the defendants Local 306 and Theatrical Stage Hands Protective Union No. 1 from all acts of violence and intimidation, from conducting mass meetings within a radius of one block of any theatre where Allied operators are employed, and from picketing any theatre with more than eight pickets. Hearings before the referee commenced September 13, 1934, and continued for fifty-two sessions. More than 6,500 pages of testimony have been taken. Briefs of counsel were submitted on September 15, 1935, and supplemental briefs on November 13, 1935.

An injunction issues in a labor dispute as a measure of protection and not of punishment. (*Nann* v. *Raimist*, 255 N. Y. 307, 315.) As in any other type of action, its purpose is to prevent a threatened wrong. Two factors must coincide: the probability that certain acts will occur, and the wrongfulness thereof. On the issue of probability, the prior occurrence of similar acts is some prophecy of their repetition, its strength depending on the circumstances. Prior occurrence, however, is not the only evidence of probability.

There is no question but that Local 306 intends to persuade members of I. T. O. A. to break the employment contracts with Allied, provided at least that this can be done without any violence, intimidation or deceit. Local 306 practically admits as much, claiming that to go that far is its legal right. Nor is there any doubt that the defendant Leffmeyers Corporation breached its contract with Allied partly, at least, as a result of the activities of Local 306. The disputed questions of fact are whether that breach was brought about by unlawful activities of Local 306, and whether the latter has been guilty of other unlawful activities which are likely to continue.

The De Luxe Theatre, which is located at the corner of Belmont and Tremont avenues in the Bronx, had been closed for some time before it was acquired by Leffmeyers Corporation in July, 1934. During the period of the necessary renovation representatives of Local 306 called frequently on Abraham Leff, the president, and attempted to induce him to enter into a contract for motion picture operators. Leff put them off with excuses, but did not tell them that his corporation was a member of I. T. O. A., and bound to Allied, until August seventh, the night before the first scheduled performance. Holmden and Castle, officers of the local, had mean-

while become impatient at the delay and on the evening mentioned they appeared at the theatre, posted pickets on the sidewalk, and succeeded in effecting a stoppage of the work of carpenters, electricians and other union workmen who were engaged in completing the repairs. Speakers appeared on the street corner, declaring that the theatre was employing non-union labor, which was not the truth. Leff then told Castle of his contract with Allied, and received the reply that " I will never open up the theatre if I don't sign up with 306." The next evening about the time for the commencement of the first performance some fifteen to twenty pickets appeared and marched in a close circle immediately in front of the entrance, practically blocking the entire sidewalk, and carrying signs bearing the names of Local 306 and of other unions, some of which stated that the theatre did not employ union labor. A crowd of several hundred people gathered across the street and two mass meetings were addressed by speakers, one within a few feet of the box office and the other only a block away. Such meetings had never been held prior to the preceding evening. The picketing continued until about midnight. Castle, Storin and Wolheim, leaders in Local 306, and many of its members were present much or all of the time. Two riot squads of the police were on hand to keep the crowds in order, although Leff had not sent for them. Similar crowds continued to be present and the picketing and meetings were carried on in the same manner every night, until Leff eventually signed an employment contract with Local 306. The attendance inside the theatre was poor, and patrons approaching the box office were addressed from the crowd across the street with the epithet " scab." One evening a stench bomb, which is a bottle or other container of chemicals emitting an exceedingly disagreeable and pervasive odor when opened, was set off inside the theatre during the performance, and another was discovered in time by the management. Meanwhile Wolheim and Storin daily importuned Leff to substitute Local 306 operators for the Allied operators, telling him that he had " stepped in with his left foot " and that he " was going to be ruined," and guaranteeing to remove the pickets if he would sign a contract with them. Leffmeyers Corporation brought a suit for an injunction against Local 306 but, after failing to obtain a temporary restraining order pending the hearing, began negotiations for peace. Leff and his associate Meyer met Holmden, Castle and representatives of Stage Hands Union No. 1 and made a settlement with them, as a result of which the Allied operators were discharged and replaced with members of Local 306, and employment given to members of Union No. 1. Holmden at once ordered Castle to remove the pickets. This meeting took place in the afternoon and

that evening there were no more pickets, no more crowds, no more mass meetings and no more stench bombs, nor have there been any at the De Luxe Theatre at any time since.

While the testimony of Leff as to the foregoing incidents is contradicted in some particulars by the defendants' witnesses, it is corroborated in part by other witnesses for the plaintiff. Leff's demeanor on the stand was unusually convincing; while he testified reluctantly, he appeared both capable and desirous of speaking the truth. There is no room for doubt that Local 306 was responsible not only for the manner in which the picketing was conducted, but also for the mass meetings, the crowds, and the verbal attacks upon the patrons of the theatre. And although there is no direct evidence connecting the stench bombs with the defendants, the coincidences of time, place and purpose are too striking to ignore. I find as a fact, therefore, that the breach of contract by Leffmeyers Corporation was induced by activities of Local 306, going far beyond peaceful picketing and fair argument.

There have been other occasions since the formation of the plaintiff when the defendant Local 306 has used illegitimate means to accomplish its purposes. At the Rugby Theatre on Utica avenue in Brooklyn, owned and operated by a member of the I. T. O. A. and employing Allied operators, a stench bomb was set off in May, 1934, with the result that people started to leave the theatre and demanded their money back or return passes. A similar occurrence took place in July, and on one evening toward the end of September a bomb in the form of a glass bottle was thrown from the balcony to the main floor, where it was shattered to pieces. Some of the patrons had their clothes ruined by the liquid, and the noise and odor caused very considerable disturbance. For several months picketing had been conducted by Local 306 quietly and more or less spasmodically, but about the middle of August mass picketing commenced, accompanied by collection of crowds, speaking at street meetings, and some disorder. This continued for several days until restrained by an injunction obtained in a suit by the theatre owner against Local 306. Two dozen or more pickets patrolled the sidewalk in front of the theatre at the same time, walking in a circle directly in front of the entrance so that no one could pass either into the theatre or along the street. On one evening the number of the pickets increased to about fifty, marching in front of the door in two concentric circles. Pickets addressed would-be patrons of the theatre as scabs and a speaker's stand was set up very close to the marquee, from which advice was given not to enter the theatre because it was unsafe, and that it might catch fire because it employed operators who did not know

their business. The crowds in the street in front of the theatre were at times so great the street cars could hardly move. On at least one evening two dozen police were present, including the police commissioner, the chief inspector, and a riot squad. Local 306 admits that the number of pickets was increased on these occasions but, according to the testimony of its supervisors and some of the pickets themselves, there was never any disturbance and the marching of the pickets was always peaceful and orderly. This testimony was largely negative in character, and far from convincing. Reliance is placed on instructions said to have been issued to the police department by the mayor, forbidding interference with mass picketing; but no text of any such instructions was put in evidence, and in any event the plaintiff's legal right to freedom from interference could not be abridged thereby. It is also argued that the crowds were due solely to the presence of the police, and the street meetings and speeches are laid to the Socialist party, which had headquarters nearby and was engaging in a political campaign. There was, however, convincing proof of active co-operation between " socialists " and some of the leaders of Local 306 in the conduct of the picketing and the meetings; and even the defendants' witness Rashbaum, who was the " supervisor of pickets," admits that when someone attempted to take a photograph of the scene in front of the theatre the crowd " seemed to dissolve into a fist fight." In the meantime the higher officials of Local 306 were calling frequently on Rosenzweig, the president of the theatre-owning corporation, with suggestions about " getting together " and threatening an increase of the activities on the street. They knew about the contract with Allied, but they declared it was valueless and offered protection against any legal difficulties in that quarter. They finally persuaded Rosenzweig to enter into a discussion of terms, on which, however, no agreement was ever reached, and at the time of the trial this theatre was still being operated by Allied.

At the Ritz Theatre, on East One Hundred and Eightieth street in the Bronx, occurrences took place very similar to those at the De Luxe and the Rugby. In the latter part of August, 1934, thirty to forty pickets were operating in front of the theatre, occupying practically the entire sidewalk and making it impossible for any one to reach the entrance of the theatre without pushing a way through. Crowds of several hundred people collected, who were sometimes very noisy. Street corner meetings were conducted at which speakers declared that the theatre was a fire trap, that Allied was a scab union, that its members were working for long hours and low wages, and that men of Local 306 had been thrown out of work and were on strike. Attempts of the owners' attorneys to take

photographs were intentionally frustrated. The New Star Theatre and the Art Theatre, both on the Southern boulevard in the Bronx and owned by the same individuals as the Ritz (though in different corporate form), were similarly picketed by Local 306, and stench bombs were set off in each of the three theatres on the same evening in September, 1933. Not long afterwards the motion picture screen at the Ritz was found slashed and ruined and the coverings of six hundred seats destroyed. Just previous to an increase in the intensity of the mass picketing and the street speeches, two representatives of Local 306 approached Mantell, president of the corporations owning these three theatres, on the subject of signing an employment contract, and told him that he need not worry about his contract with the Allied; and when he replied that his counsel had advised that the Allied contract must be lived up to, they declared that in that event " they were going to go on with the works," and asked if he wanted to ruin himself.

Stench bombs were set off and other acts of vandalism perpetrated at several other I. T. O. A. theatres manned by Allied operators and picketed by Local 306. Stench bombs were set off in the Criterion, the Casino, the Mayfair, the Monroe, the Times Square, the Liberty, the Carleton, and the Globe. One night in September, 1933, the Monroe Theatre was entered, the watchman tied up, the motion picture screen, carpets and curtains slashed, and the projection and sound apparatus broken. In July, 1934, at the Criterion Theatre the electric power cable was severed near the projection booth. While none of these acts has been proved the work of any particular member of the defendant unions, there is evidence that officers of Local 306 acknowledged power to prevent a repetition of the occurrences and even considered reimbursement for the damage.

One other weapon was adopted by Local 306 in its struggle with the Allied union. Circulars were printed and distributed by the pickets and others to the crowds at the theatres and mass meetings, which contained sundry unquestionably false statements about the plaintiff and about the controversy. It is stated in these circulars, for example, that members of Local 306 were not only on strike, but striking for higher wages and shorter hours. No strike existed, however; the defendants were not employees seeking better terms from their employers, but unemployed workers seeking to obtain for themselves jobs held by others. The existence of a strike, to be sure, is not a condition of the right to picket (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin,* 245 N. Y. 260, 263); but the mere suggestion of a contest between employee and employer embraces, and must have been intended to embrace, an appeal to sympathy. which is absent from a quarrel between competitors on the same

level.   The above-mentioned statement further implies that the Allied operators receive lower wages and work longer hours than those demanded by Local 306, which is untrue, as hereafter pointed out.   In spite of the repudiation of these circulars by the defendants at the trial, their printing by someone in authority at the head-quarters of Local 306 was completely demonstrated.

While little reference has been heretofore made to the activities of the defendant Stage Hands Union No. 1, the proof shows that not only the pickets of this defendant but also its higher representatives were co-operating with Local 306 for the common objective of employment of members of both unions in place of Allied operators.   In the negotiations between the owners of the De Luxe and Ritz Theatres and the officers of Local 306, the latter always insisted that each theatre must employ a stage hand even though there was no special work for him to do.   Leff's settlement with Holmden embraced settlement with Union No. 1, and Holmden's directions to his subordinate to remove all pickets resulted in withdrawal of the stage hands' pickets as well as those of Local 306.   So far as the evidence goes, wherever there was picketing at least one picket from Union No. 1 was present, marching in company with the pickets of Local 306 and taking instructions from the same supervisors.   It is unquestionable that these two defendant unions are acting not only in harmony, but under a common plan and with a common purpose.

On this state of facts what relief should be accorded the plaintiff? The intimidation and false statements were clearly illegal, as well as the vandalism, and their repeated use justifies a reasonable fear of their continuance unless enjoined.   They are not excused by the pressure of emotion humanly engendered through intense economic rivalry.   The test of granting an injunction against specific acts of misconduct is neither the commission of a crime nor the adequacy of the criminal law; some acts may be enjoined although they are also crimes or disorderly conduct (Frankfurter & Greene, The Labor Injunction, p. 23, note 97), while others may be enjoined which are neither.   The test is the probability of wrongful harm to the plaintiff, tempered by a balancing of equitable considerations.   The defendants cannot justly complain if they are enjoined from further use of stench bombs and similar acts of vandalism (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260, 263); from circulating false or misleading statements, printed or oral (*Wilner* v. *Bless*, 243 N. Y. 544); and from organizing, encouraging and participating in the collection of crowds and holding of street meetings in the immediate neighborhood — say one block — of any theatres which employ Allied operators (*Nann* v. *Raimist*, 255

N. Y. 307, 314). The acts last mentioned are in themselves forms of intimidation and also likely to result in violence, disorder and misrepresentation. In granting an injunction to the extent indicated, there is even less cause for hesitation than might have been felt before the enactment of chapter 299 of the Laws of 1935, which authorizes jury trials in contempt cases and has been held constitutional at Special Term. (*Kronowitz* v. *Schlansky,* 156 Misc. 717.)

Greater difficulty is presented in the question whether the defendant unions should be enjoined from using even peaceful and honest methods of persuasion to induce I. T. O. A. and its members to break their contracts with the Allied union and employ members of Local 306 and Stage Hands Union No. 1 in place of their present employees. Whatever the law may be in other jurisdictions (See *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229; *American Steel Foundries* v. *Tri-City Trade Council,* 257 id. 184; *Levering & Garrigues Co.* v. *Morrin,* 71 F. [2d] 284), it has been established by the Court of Appeals as the law of New York that interference with employment relations in a *bona fide* controversy over conditions and terms of employment is permissible when restricted to lawful methods (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin, supra*), even though such interference involves a breach of contract. (*Stillwell Theatre, Inc.,* v. *Kaplan,* 259 N. Y. 405.) On the other hand, even peaceful picketing may be enjoined where violence, intimidation and misstatements have already been resorted to and the course of conduct has been such as to indicate the danger of injury if any picketing whatever is allowed. (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin, supra; Steinkritz Amusement Corp.* v. *Kaplan,* 257 N. Y. 294.) The right to peaceful picketing and persuasion, however, is not *necessarily* forfeited because the picketing theretofore carried on has been accompanied by unlawful acts. (*J. H. & S. Theatres* v. *Fay*; 260 N. Y. 315; *Wise Shoe Co.* v. *Lowenthal,* 266 id. 264.) "The injunction must be limited to prohibition of specific unlawful acts except in so far as a broader prohibition has for its legitimate end protection against such acts." (*J. H. & S. Theatres* v. *Fay, supra,* p. 321.) "The principles governing the granting of such injunctions and the limitations upon their terms have been repeatedly stated, yet we find, as do the lower courts, perplexities in application to ever changing circumstances and devices. * * * We have to fit the law to each set of facts." (*Wise Shoe Co.* v. *Lowenthal, supra,* pp. 267, 268.) Whether in view of the record of their past conduct the defendants should be given another chance to picket peacefully and in order is at once a question addressed to the discretion of the trial court and a challenge to

its wisdom. (*Nann* v. *Raimist, supra,* p. 315.) The challenge must be accepted conscientiously and with humility.

The controversy between these unions involves more than the competing desires of two groups of operators for the same employment. Each group claims to be not merely seeking the work for its own members, but striving for the establishment of an employment system which will benefit all workers in this field of occupation and even the general public. In neither system does the theatre manager enter into a direct contract with the individual operators, but in each a contract is made between the theatre and the union for the operation of the projection booth by members of the contracting union at a lump sum figure, the number of operators required being determined by the union. The system of operation used by the Allied union provides for one operator at a time, two operators dividing the day and each working from five to six and one-half hours a day six days a week, supplemented by relief operators for the seventh day and for meal hours. Each regular operator is paid from $43 to $57.50 a week, the amount apparently varying with the size of the theatre as well as the number of hours, the latter in turn varying with the policy of the management, but not exceeding forty hours a week. Under the system employed by Local 306, the operators work in pairs, the projection booth being always occupied by two men at a time. This usually means that four regular operators are employed daily, although at the Ritz and Art Theatres prior to September, 1933, two operators with the relief man did all the work, each regular operator working forty-eight hours a week. There is also a relief system to take care of the seventh day. The amount received by an operator belonging to Local 306 for a full week's work appears to be from $38 to $50 per week. Although this is somewhat less than the weekly wage of an Allied operator, the total weekly payroll of the theatre is considerably larger under the system of Local 306 than under the Allied system, not only because of the double crews but because the employment of Local 306 always implied and required a separate and additional contract for a stagehand, a member of Union No. 1. For example, during the period that the De Luxe Theatre was employing Allied operators, its total payroll was $142.50 a week, whereas its payroll for the four regulars and one relief man of Local 306 is $200 a week plus an additional $32.50 for the stagehand; and while the weekly payroll at the Rugby Theatre under the Allied two-operator system is $115, the lowest price offered by Holmden in September, 1934, for operating the booth under the four-man system was $168. The prices asked by Local 306 seem not to have been rigid, but subject to bargaining;

and they may have also varied with changing circumstances. When the Rugby had once before been operated by Local 306, in August, 1930, the weekly payroll was $220.

Local 306 justifies its system to its own members by the fact that it provides work for more men. For the public it claims that a double crew furnishes a smoother and speedier service of the machines, resulting in a better exhibition of the pictures, and also an additional safety precaution against fire in the projection booth. To this Allied replies not only that its operators receive higher individual wages, but that all the necessary work in the booth can be done by one man at a time, that any difference in the quality of the exhibition is a matter between the theatre and its patrons, and that the fire protection complies with the municipal regulations.

There is insufficient evidence on which to base a determination of the relative merits of these conflicting claims; but it is unnecessary to make any such decision in the present litigation. Courts do not exist for the purpose of determining questions of social or economic policy. When parties are engaged in a genuine economic controversy, the interference of a court should be exercised sparingly and with caution. (*Moran* v. *Lasette*, 221 App. Div. 118, 121.) A sweeping injunction against interference of every kind with the plaintiff's contract would hamper a determination of the economic issue in the economic forum. If the defendants can offer to the theatre owners and to the public better service than the plaintiff, and restrict themselves to lawful methods in campaigning to secure its adoption, the mere fact that they have transgressed the bounds of legality in the past should not, in my opinion, foreclose them from all opportunity for fair competition during the remaining eight years of the plaintiff's contract. While there appears to be nothing unlawful *per se* in a contract between employers and a labor union for a ten-year period where the terms continue satisfactory to both parties and the wage provisions, as here, are subject to review and adjustment every second year, such a contract in my opinion would be more nearly open to defendant's charge of violating public policy if guaranteed against fair competition by the injunctive power of a court of equity. I conclude, therefore, that the injunction should not be granted to the full extent demanded by the plaintiff.

So far as picketing is concerned, the defendants, Local 306 and Union No. 1, will be permitted to post at any theatre (with the exception hereinafter noted) not more than two pickets at the same time. This will give fair opportunity to present their claims to the public, and any larger number would seem more provocative than useful. It should be remembered that most of these theatres are small houses, and the place of operation is the sidewalk of a city

street. It is of no importance whether such pickets are representatives of the same union or whether one represents each of these defendants. The pickets may carry signs or placards which refrain from any untruthful statements about the controversy, and they may also distribute truthful circulars or other literature, but may not otherwise accost or interfere with the patrons of the theatre. The pickets shall not pass immediately in front of the entrance or come within five feet of the entrance, and the two pickets shall remain on opposite sides of the entrance. They shall not act in concert with or associate themselves in any way with pickets of any other organization which may at any time be picketing the same theatre.

Nor should the defendants be enjoined from other direct attempts to induce the theatre owners to enter into employment contracts, provided they refrain from violence, intimidation, misrepresentation and other unlawful conduct toward the employers, their patrons and their employees.

The rights to be preserved to the defendants with respect to picketing and solicitation of employment should not however, in my opinion, extend to the De Luxe Theatre. The victory achieved by the defendants with respect to that theatre has been achieved by unlawful methods and they should not be permitted to retain the benefit of their wrongdoing. The contract which had been violated is a collective bargaining contract in labor relations and as such is entitled to the protection of the court against unlawful interference. (*Nann* v. *Raimist*, 255 N. Y. 307; *Schlesinger* v. *Quinto*, 201 App. Div. 487; *Goldman* v. *Cohen*, 222 id. 631.) The owner of this theatre having already breached the contract under pressure may well be considered less able to exercise an independent judgment in the face of future approach by the defendants, and the plaintiff may fairly be accorded additional protection in this special instance. A decree of specific performance against this defendant will also be awarded to the plaintiff.

Careful consideration has been given to two objections raised by the defendant unions to the granting of any relief whatever to the plaintiff. In the first place, it is argued that the contract between I. T. O. A. and Allied is against public policy because Allied is a " company union; " and to support this contention the defendants refer to the opinions at Special Term and in the Court of Appeals in a prior suit between Local 306 and I. T. O. A. (*Sherman* v. *Abeles*, 150 Misc. 497; 265 N. Y. 383.) In granting a motion for an injunction *pendente lite* in that case, the court at Special Term declared on the affidavits before it that " Allied is a ' company union.' " The injunction order was reversed in the Court of Appeals

on the ground that it was unwarranted in law even upon the recital of facts found at Special Term, including a finding (as interpreted by CROUCH, J.), " that Allied was a company-controlled company union." Whatever the relevancy of that fact might be in the present litigation, there is insufficient basis for such a finding here. The record and orders in *Sherman* v. *Abeles* are not in evidence, and even if they were, the injunction order would not be *res adjudicata*, on the double ground that it was not a final judgment and that it has been since reversed. (*Rudd* v. *Cornell*, 171 N. Y. 114, 129; *Loeb* v. *Willis*, 100 id. 231, 235.) The term " company union " has no definition in the law of this State and seems to have no fixed or certain definition in industrial literature. Whether strictly applicable to a union of the employees of a group of corporations in the same industry independently owned but associated for certain common purposes, is perhaps a matter of opinion; but in any event the evidence produced here on both sides points to the conclusion that Allied is not and has never been under the domination and control of I. T. O. A., although the latter encouraged its organization and welcomed the opportunity to do business with it. Some of the leading members of I. T. O. A. had been dissatisfied in their relations with Local 306 under the latter's former leadership, and the testimony is convincing that members of Local 306 had felt a similar dissatisfaction and worked sincerely for the formation of another union which they believed, rightly or wrongly, would more efficiently promote their interests. It is becoming recognized that unions organized on the company plan may retain an ominous independence of their employers. (*N. Y. Times,* Oct. 27, 1935, p. 16.) On this point, moreover, there is considerable vagueness in the defendants' legal theory. They point to section 17 of the Civil Rights Law, added by chapter 11 of the Laws of 1935, which is expressly limited to contracts made thereafter. Defenses based on the National Industrial Recovery Act and the Shackno Act (Laws of 1933, chap. 781) have been withdrawn since the decisions in *Schechter Poultry Corp.* v. *United States* (295 U. S. 495) and *Darweger* v. *Staats* (267 N. Y. 290). This objection of the defendants is, therefore, overruled.

The second general objection raised by the defendants is based on section 876-a of the Civil Practice Act, added by chapter 477 of the Laws of 1935, regulating the issuance of injunctions, and it is contended that no injunction can be now issued because of non-compliance with the conditions precedent prescribed by this section. The plaintiff replies that the section is not intended to apply to actions commenced before its enactment; that it would be unconstitutional if retroactive, and that it is also unconstitutional

for other reasons. Conflicting decisions have been rendered at Special Term on some of these contentions. In *Aberdeen Restaurant Corp.* v. *Gotfried* (N. Y. L. J. July 2, 1935, p. 18) SCHMUCK, J., declared the statute applicable to pre-existing actions and denied an injunction, although the opinion fails to make clear the respects in which the statute had not been complied with, the court merely stating in this connection that " although a hearing in open court has been had and witnesses have appeared and been examined and cross examined, there is good cause to believe that the conditions imposed by the statute have not been complied with by the plaintiff." In *De Agostina* v. *Signal Theatre Corporation* (N. Y. L. J. Aug. 6, 1935, p. 383) CONWAY, J., applied the statute to a case commenced since its enactment and denied a permanent injunction after trial. On the other hand, in *Micamold Radio Corporation* v. *Beedie* (156 Misc. 390) CROPSEY, J., held the act inapplicable to pending actions, and in addition to raising doubts about its constitutionality he questioned the applicability of its provisions in any event to the granting of permanent injunctions after trial of the issues. In *De Agostina* v. *Haruth-Amusement Corporation* (N. Y. L. J. June 21, 1935, p. 3212; affd., without opinion, 246 App. Div. 604) Justice McGEEHAN granted a permanent injunction after the trial of an issue of fact, expressly holding that section 876-a was inapplicable, although he did not state whether this was because there had been a trial of the issues or because the action had been commenced before the enactment of the law. I do not find it necessary, however, to decide any of these broad questions in order to dispose of the pending issues. In the first place, the injunction now to be granted is not based on affidavits, but a full trial has been had with open examination and cross-examination of all the witnesses offered on both sides. Secondly, any points that might otherwise have been raised with respect to the form of the complaint and the service of a bill of particulars must be deemed to have been waived by the defendants, who continued with the trial, calling witnesses of their own and cross-examining the plaintiff's witnesses, after the statute had become effective without making any timely motion based thereon. In the third place, the requirements of subdivision 1 of section 876-a with respect to special findings of fact can be fulfilled by embodying these findings in the referee's report. The injuries to the plaintiff have not been prevented by police protection; nor will the injunction as above outlined exclude reasonable freedom with respect to the items listed in the subclauses of paragraph (f) of said subdivision 1. With respect to the requirement of proof of efforts

to settle the dispute by negotiations or otherwise, I find that the evidence of negotiations carried on by members of I. T. O. A. with the officers of Local 306, which were known to the plaintiff, coupled with previous attempts by members of Allied before and at the time of its organization to ameliorate existing internal conditions in Local 306, of which they were then members, constitute proof of " every reasonable effort " at settlement within the meaning of this provision (§ 876-a, subd. 4). The arguments of the defendants have failed to specify any " obligations imposed by law which are involved in the labor dispute in question," compliance with which has not been proved in accordance with subdivision 4. Accordingly I find nothing in section 876-a which is a bar to the granting of the relief indicated.

Plaintiff's attorneys are requested to draft a form of report along the lines of this opinion and serve the same on defendants' attorneys with not less than five days' notice of settlement, at which time further requests for findings may be filed by either side. The proposed conclusions of law should include the exact phraseology to be incorporated in the injunction. The motions to dismiss the complaint and all motions to strike out evidence on which rulings have been reserved are denied.