EXCHANGE BAKERY & RESTAURANT, INC., Respondent,
v. LOUIS RIFKIN, Individually and as President of
WAITERS AND WAITRESSES UNION LOCAL No. 1, et al.,
Appellants.

Injunction — labor unions — strikes — picketing — labor
union may call strike and picket premises of employer —
means used must not be unlawful — remedy for unlawful
acts — equity may be invoked only for protection in future —
quære whether labor union may lawfully persuade its members
or others to end contracts — error to grant injunction restrain-
ing picketing where it does not appear that wrongful acts
committed at inception of strike will be repeated — appeal —
Court of Appeals must review new findings made by Appellate
Division and determine whether they are sustained by evidence.

1. A labor union may call a strike and picket the premises of an
employer with the intent of inducing him to employ only union labor.
" Picketing " may not be accompanied, however, by violence, trespass,
threats or intimidation express or implied. No crowds may be
collected on or near the employer's property. The free entrance of
strangers, customers or employees may not be impeded. There may
be no threats — no statements oral or written, false in fact, yet
tending to injure the employer's business.

2. Where the end or the means are unlawful and the damage has
already been done the remedy is given by a criminal prosecution or
by a recovery of damages at law. Equity is to be invoked only to
give protection for the future. To prevent repeated violations,
threatened or probable, of the complainant's property rights, an
injunction may be granted, but unless the need for protection appears,
equity should decline jurisdiction.

3. Quære, whether a labor union may lawfully persuade its members
or others to end contracts of employment where the final intent lying
behind the attempt is to extend its influence.

4. Where, at the commencement of a strike, two isolated wrongs
were committed, but, thereafter, activities of the strikers were con-
fined to " picketing " by two women bearing placards, containing
nothing untruthful, and there was no violence; no intimidation; no
obstruction of entrances to the premises; no collection of crowds and
no indication that the wrongful acts would be repeated, it was error to

grant an injunction restraining the defendants from " patrolling the sidewalk and street in front of and near the plaintiff's premises, from approaching, accosting, threatening, assaulting or intimidating any person desiring to enter the premises, from blockading the entrance thereto, from collecting crowds, from exhibiting any signs or notices in the vicinity, from suggesting a boycott, and from coercing or intimidating any person seeking to enter the employment of the plaintiff."

5. A court of equity should not intervene where there is no evidence that wrongs have been committed or threatened on the theory that defendants are not harmed by the prohibition of unlawful acts.

6. Where findings of fact of the trial court are reversed by the Appellate Division and new findings made on which judgment is directed, it becomes the duty of the Court of Appeals, on appeal from that judgment, to review the new findings and determine whether they are sustained by the weight of the evidence. (Civ. Pr. Act, § 589.)

*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin,* 216 App. Div. 663, reversed.


(Argued May 10, 1927; decided May 31, 1927.)


APPEAL from a judgment, entered June 18, 1926, upon an order of the Appellate Division of the Supreme Court in the first judicial department, reversing a judgment in favor of defendants entered upon a decision of the court on trial at Special Term and directing judgment in favor of plaintiff.


*Harold H. Corbin, Max D. Steuer* and *Edward J. Bennett* for appellants.   The evidence clearly established that a *bona fide* strike was called by the defendants on the basis of a real and actual grievance.   (*Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229; *Bossert* v. *Dhuy,* 221 N. Y. 342; *Nat. Protective Assn.* v. *Cumming,* 170 N. Y. 315; *Wood Mowing & Reaping Machine Co.* v. *Toohey,* 114 Misc. Rep. 185; *Jones* v. *Maher,* 62 Misc. Rep. 388; 141 App. Div. 919; *Winich* v. *Shankland,* 59 App. Div. 619.)   The evidence showed and the trial court properly found that the picketing maintained by

defendants was peaceable, lawful and free from violence, intimidation or other oppressive tactics. (*Wood Mowing & Reaping Machine Co.* v. *Toohey*, 114 Misc. Rep. 185; *Segenfeld* v. *Friedman*, 117 Misc. Rep. 731; *Foster* v. *Retail Clerks Protective Assn.*, 39 Misc. Rep. 48.)

*Carl Sherman* for respondent. The right to strike is not absolute, but relative. The calling of a strike with its accompaniment of picketing here amounted to actionable interference. (*Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229; *Campbell* v. *Gales*, 236 N. Y. 457; *Lamb* v. *Cheney & Son*, 227 N. Y. 418; *Posner Co.* v. *Jackson*, 223 N. Y. 325; *Bossert* v. *Dhuy*, 221 N. Y. 342.) The injunction properly prohibits all picketing since picketing may be resorted to only in the case of a legitimate strike. Not only was the " strike " called for an unlawful purpose, but it was declared in violation of the union constitution and by-laws. (*Truax* v. *Corrigan*, 257 U. S. 312; *American Steel Foundries* v. *Tri-City C. T. Council*, 257 U. S. 184.)

Andrews, J. A workman may leave his work for any cause whatever. He need make no defense, give no explanations. Whether in good or bad faith, whether with malice or without, no one can question his action. What one man may do, two may do or a dozen, so long as they act independently. If, however, any action taken is concerted; if it is planned to produce some result, it is subject to control. As always, what is done, if legal, must be to effect some lawful result by lawful means, but both a result and a means lawful in the case of an individual may be unlawful if the joint action of a number.

A combination to strike or to picket an employer's factory to the end of coercing him to commit a crime, or to pay a stale or disputed claim would be unlawful in itself although for an individual, his intent in leaving work does not make wrongful the act otherwise lawful.

His wrong, if wrong there be, would consist of some threat, of something beyond the mere termination of his contract with his employer.   Likewise a combination to effect many other results would be wrongful.   Among them would be one to strike or picket a factory where the intent to injure rests solely on malice or ill will. Another's business may not be so injured or ruined. It may be attacked only to attain some purpose in the eye of the law thought sufficient to justify the harm that may be done to others.

The purpose of a labor union to improve the conditions under which its members do their work; to increase their wages; to assist them in other ways may justify what would otherwise be a wrong.   So would an effort to increase its numbers and to unionize an entire trade or business.   It may be as interested in the wages of those not members, or in the conditions under which they work as in its own members because of the influence of one upon the other.   All engaged in a trade are affected by the prevailing rate of wages.   All, by the principle of collective bargaining.   Economic organization to-day is not based on the single shop.   Unions believe that wages may be increased, collective bargaining maintained only if union conditions prevail, not in some single factory but generally.   That they may prevail it may call a strike and picket the premises of an employer with the intent of inducing him to employ only union labor.   And it may adopt either method separately.   Picketing without a strike is no more unlawful than a strike without picketing. Both are based upon a lawful purpose.   Resulting injury is incidental and must be endured.

Even if the end sought is lawful, the means used must be also.   " Picketing " connotes no evil.   It may not be accompanied, however, by violence, trespass, threats or intimidation express or implied.   No crowds may be collected on or near the employer's property.   The free entrance of strangers, customers or employees may not be

impeded. There may be no threats — no statements oral or written, false in fact, yet tending to injure the employer's business. We here make no attempt to enumerate all the acts that might make picketing illegal. Doubtless there are others. When the situation in a particular case comes to be reviewed by the courts there will be no difficulty in drawing the line between acts permissible and acts forbidden.

We have been speaking in terms of the workman. We might equally have spoken in terms of the employer. The rule that applies to the one also applies to the other. The latter may hire and discharge men when and where he chooses and for any reason. But again any combination must be for lawful ends secured by lawful means. If believed to be for their interests employers may agree to employ non-union men only. By proper persuasion they may induce union men to resign from their unions. They may not, however, because of mere malice or ill will, combine to limit the opportunities of any one to obtain employment. The means adopted must be lawful. No violence or intimidation, no threats, no trespass, no harmful false statements, no means that would be improper were the workman the actor.

In writing as we have done, we have in mind cases where the strike, the picketing or the lockout is made use of by associates in the same trade or business; where the end sought, therefore, directly affects those, masters or men, engaged therein. We do not consider so-called sympathetic strikes, boycotts or lockouts where interest is more remote. Questions that may arise under such circumstances are not before us. Neither do we consider strikes or lockouts not connected with labor disputes, but designed to enforce political action.

Where the end or the means are unlawful and the damage has already been done the remedy is given by a criminal prosecution or by a recovery of damages at law. Equity is to be invoked only to give protection for the future.

To prevent repeated violations, threatened or probable, of the complainant's property rights, an injunction may be granted. This is no novel assumption of jurisdiction. For many years, while leaving to the law redress for single or isolated wrongs to property rights, where there is danger of their repetition, the chancellor has used this weapon to protect the innocent. The theoretical basis of this power has been said to be the avoidance of a multiplicity of actions. Whatever the basis, however, the power is undoubted. It has been exercised in many ways. Repeated trespasses have been prevented; the continued pollution of streams; the maintenance of nuisances; the misuse of a trade name. Other instances might be cited. The rule is not different where behind the facts presented to the court lies a labor dispute. Freedom to conduct a business, freedom to engage in labor, each is like a property right. Threatened and unjustified interference with either will be prevented. But the basis of permissible action by the court is the probability of such interference in the future, a conclusion only to be reached through proof contained in the record. Unless the need for protection appears, equity should decline jurisdiction.

In the case before us findings of fact were made by the Special Term resulting in a judgment for the defendants. Most of such findings were reversed by the Appellate Division. As a substitute new findings were made by that court and a sweeping injunction was granted to the plaintiff. It, therefore, becomes our duty to review these findings and to determine for ourselves whether they are sustained by the weight of the evidence. (Civ. Prac. Act, sec. 589.)

In 1918 the plaintiff corporation was formed. From the first its intention was to employ only non-union waitresses in its restaurant. Always, with one exception, an applicant for employment was questioned as to her membership in any union and only those who denied

such a connection were engaged. No contract as to this matter was then made but the applicant was hired at the rate of $8 per week for full time or $5 for half time. This hiring was at will and might be ended at any time by either party. (*Cuppy* v. *Stollwerck Brothers,* 216 N. Y. 591.) Thereafter the waitresses were asked repeatedly if they had joined a union. They always denied it. If it had been discovered that their denials were untrue they would have been at once discharged. Also after beginning work each waitress signed a paper stating that it was the understanding that she was not a member of any union, pledging herself not to join one or if she did to withdraw from her employment. She further promised to make no efforts to unionize the restaurant, and says that she will attempt to adjust by individual bargaining any dispute that may arise. This paper was not a contract. It was merely a promise based upon no consideration on the part of the plaintiff. From fourteen to sixteen waitresses were employed and so far as appears the conditions of their work was satisfactory to them.

The three defendants are members of a waiters' union. Its schedule of wages is $15 a week for full time and $10 for half time. Apparently at their instigation four waitresses joined the union after employment was obtained. They had not been members on the date when they were originally engaged. The fact that they had done so was not known to the plaintiff. Efforts were also made to induce other employees to take the same course. At the same time the plaintiff was asked to unionize its restaurant, but it refused.

The Appellate Division has based its decision in part upon the theory that the defendants wrongfully attempted to persuade the plaintiff's employees to break this alleged contract. Even had it been a valid subsisting contract, however, it should be noticed that whatever rule we may finally adopt, there is as yet no precedent in this court for the conclusion that a union may not persuade its

members or others to end contracts of employment where the final intent lying behind the attempt is to extend its influence. In *Lamb* v. *Cheney & Son* (227 N. Y. 418) we said that where a specific contract of employment for a definite time exists another may not intentionally, without just cause or excuse, interfere therewith. In *Posner Co.* v. *Jackson* (223 N. Y. 325) an employee, having made an express contract to perform specific, unique and extraordinary services for a fixed period, was induced to break it by a rival manufacturer. She might herself have been enjoined from violating her negative covenants. So he who persuaded her to do so might be held in damages. Finally in *Reed Co.* v. *Whiteman* (238 N. Y. 545) it was sought to use these cases as authority to support an injunction against a labor union which was persuading employees who were engaged under a written contract from week to week, to strike. In that case, however, there was a finding, binding upon us, to the effect that the action of the union was " with the intent and purpose solely of preventing plaintiff from doing any business and of ruining plaintiff in its business, and bringing disorder into plaintiff's business." Contract or no contract such an act, induced solely by malice, was wrongful. Here, however, we do not need to decide whether where the object of the act is to aid in a labor dispute, there is just cause or excuse for such interference with existing contracts, and if not how specific the contract must be, nor how substantial the term of employment contained therein to permit equity to intervene. Nor need we discuss the correlative question as to how far contracts made by unions with their members, providing that they are to work only in union shops, are to be protected.

On April 22, 1925, some of the defendants representing the union entered the plaintiff's restaurant as ordinary customers. They did this, however, with the preconceived design of causing a strike by blowing a whistle at a time inconvenient to the plaintiff when many patrons were

present. In so acting they were clearly trespassers and if such trespasses were to be continued in the future they might be enjoined. It was an isolated wrong, however, and adequate compensation might be recovered in an action at law. When the strike was declared the four waitresses who had joined the union at once stopped work and left the premises. In so doing one of them threatened an officer of the plaintiff and she interfered with the access of a patron of the restaurant. A crowd collected but was soon dispersed. Again we have an isolated instance of intimidation occurring at the outset of the strike. Thereafter there was picketing which consisted of two women walking in the street close to the curb but near the premises, having placards ten by sixteen inches in size pinned to their dresses and bearing the legend: " Waitresses Strike Picket. Waiters Union Local No. 1. Affiliated with the American Federation of Labor and the United Hebrew Trades." There was no violence; no intimidation; no obstruction of entrances to the premises; no collection of crowds. This course of conduct continued for four days until it was ended by a temporary injunction.

Under such a state of facts the defendants have been enjoined from " patrolling the sidewalk and street in front of and near the plaintiff's premises, from approaching, accosting, threatening, assaulting or intimidating any person desiring to enter the premises, from blockading the entrance thereto, from collecting crowds, from exhibiting any signs or notices in the vicinity, from suggesting a boycott, and from coercing or intimidating any person seeking to enter the employment of the plaintiff." In this we think the Appellate Division has erred.

As we have indicated, the action of those defendants who entered the restaurant when the strike was called was a trespass. There is, however, no indication that such acts will be repeated. There was no contract between

the plaintiff and its waitresses in regard to the union with which the defendants can be said to have interfered. There is nothing untruthful in the placards carried by the pickets, even assuming that the word " strike " is to be confined to cases where some of those who have become employees of the plaintiff have left its employment to obtain relief in a labor dispute. Such was the case here. Three of these four waitresses were employed by the plaintiff long before they became members of the union. Their reply to inquiries then made was entirely truthful. To the fourth, no questions were put. If they subsequently joined the union they might have been discharged; but until they were discharged they remained in the plaintiff's employment. Except on the one occasion the picketing was entirely lawful and for a lawful object, although the plaintiff's business might be injured thereby. It is said that the strike was not properly called because of the neglect of some preliminaries which the union rules required in such a case, and that the four waitresses referred to were not properly members of the union because their dues had not been paid. This is a question as to which the plaintiff is not interested.

It is quite true that where unlawful picketing has been continued; where violence and intimidation have been used and where misstatements as to the employers' business have been distributed, a broad injunction prohibiting all picketing may be granted. The course of conduct of the strikers has been such as to indicate the danger of injury to property if any picketing whatever is allowed. Such is not this case. Nor should a court of equity intervene where there is no evidence that wrongs have been committed or threatened on the theory that the defendant is not harmed by the prohibition of such unlawful acts.

The judgment of the Appellate Division should be reversed and that of the Special Term affirmed, with costs in this court and in the Appellate Division.

CRANE, J. (dissenting).   I agree with my brother ANDREWS in his statement of the law, but I disagree in his application of it to the facts of this case.   The plaintiff, a man and wife affair, maintained a little bakery and restaurant, employing ten to fifteen waitresses. The proprietor had determined to operate by non-union employees.   This was his privilege, and he was entitled to the same protection in the exercise of it as those who maintained union shops.   His employees stated when employed that they did not belong to the union and that they would let him know if they joined it.   It was understood that a union employee could not work in the place. The plaintiff's employees were perfectly satisfied; no fault was found either with their pay or with conditions.   The defendant, however, determined that this condition should cease, and threatened the proprietor if he did not join the union.   For the purpose of carrying out the threat, the union "planted" one of its members in the plaintiff's restaurant.   She was there by deception, claiming to be a non-union employee.

One day the defendant's leader came in and told the proprietor and his wife that they had to join the union, or he would end their business.   They refused, he blew a whistle, called a strike, scared the customers and the non-union employees.   The "planted" employee and two or three others who had secretly joined the union left. They would have been discharged anyhow, if it were known to the plaintiff that they belonged to the union. Thereafter, employees paraded up and down in front of the plaintiff's store with placards announcing that there was a strike among the employees; a customer entering the place was seized by the collar and pulled out by the "planted" employee with the statement that the employees were on a strike.

These statements and representations were false. There were no members of the defendant union to go on a strike.   A strike indicates that the employees are

dissatisfied, and that they have walked out from the employment in which they were engaged because of dissatisfaction.   In this case, the strike indicated that the defendant union had employees in the store who were dissatisfied.   The defendant union had no employees in this non-union shop except through deception.   They could not have stayed if the fact was known.   How, then, could there be a strike of the union employees?   The plaintiff's non-union workers were perfectly satisfied, and there was no strike among them.

That the defendant and its agents exercised violence for the purpose of breaking up the plaintiff's business or compelling it to join the union is apparent from reading the prevailing opinion; that the plaintiff had a non-union shop and strived to maintain it is also apparent.   To say that he had a right under the law to maintain it as such is of little value unless the law protects the right.   The main opinion says that for the violence and the conceded trespass this shopkeeper should have resorted to the criminal law, and not to a court of equity for an injunction. We cannot shut our eyes to the delay of criminal proceedings.   By the time the defendant's agents had been arrested, brought to trial and sentenced, the little shopkeeper would be out of business and his rights under the law to maintain a non-union shop become a mere declaration.

The union had a right to inform people that the plaintiff maintained a non-union shop, and to request them not to patronize it; it could also picket the place with placards to this effect, but to say that the place was on a strike when there was nobody to strike, and to threaten the proprietor and its customers with violence, if it did not join the union, was unlawful.   Both the plaintiff and the defendant had equal rights before the law, and all that is called for under the law is fair play on both sides. When a right is violated, it is the duty of the courts to protect it.   The protection of one man's rights, no

matter how humble, is the protection of the rights of all.

For these reasons I dissent.

CARDOZO, Ch. J., POUND and LEHMAN, JJ., concur with ANDREWS, J.; CRANE, J., dissents in opinion in which KELLOGG and O'BRIEN, JJ., concur.

Judgment accordingly.