Busch Jewelry Co., Inc., and Others, Plaintiffs, *v.* United Retail Employees' Union, Local 830, and Others, Defendants.*

Supreme Court, Special Term, New York County, June 28, 1938.

*Scandrett, Tuttle & Chalaire* [*B. Phillips* of counsel], for the plaintiffs.

*Samuel M. Sacher*, for the defendants.

Cotillo, J.   In this action, brought by three plaintiffs against the defendant union local and its officers, approximately one

* See, also, 169 Misc. 156.

hundred specific instances (some repetitious) of illegal, unwarranted and socially improper conduct are claimed to have been established upon the trial as the basis for the permanent injunction demanded. The plaintiff Busch Kredit Jewelry Co., Inc., operates five stores in the borough of Manhattan and Bronx; the plaintiff Busch Jewelry Co., Inc., operates five stores in the boroughs of Brooklyn and Queens; and the plaintiff Klark Kredit Klothes, Inc., operates two stores in Manhattan. Substantially all sales made by plaintiffs are paid for by the customer in weekly installments, approximately eighty-five per cent of which payments are made by the customer personally at plaintiffs' stores, ten per cent through the mails, and the balance, five per cent, through outside collectors, employed by plaintiffs, who call at the homes of the customers.

The defendant local is, as its name implies, an organization of employees of retail merchants, the individual defendants being officers of said local. Prior to May 15, 1938, a contract covering wages. hours and working conditions had been entered into between the local and plaintiffs, which by its terms expired on that date. One of the questions which was litigated here concerns the events which transpired upon the expiration of the agreement. Plaintiffs contend that prior to such expiration negotiations for a new contract had been instituted and while in progress were arbitrarily broken off by the defendants. At one stage of the conferences defendants refused to negotiate with a stenographer present and withdrew from the proceedings for that reason, but later did accept the presence of a stenographer. On the other hand, defendants assert that plaintiffs " locked out " its former employees. Persuasive proof was offered, however, that the managers of the various stores were instructed by plaintiffs to permit all employees involved in the dispute to return to work forthwith if they presented themselves for that purpose, but that this offer was not taken advantage of by the employees and the strike was instituted. Plaintiffs endeavored to negotiate the differences and the parties did meet on various dates in May and June for this purpose, the last meeting being held at the office of the New York State Mediation Board in the presence of one of the members of such Board, at which plaintiffs submitted a written offer covering wages and hours. The evidence fully establishes that plaintiffs were willing to and did endeavor to settle the dispute by arbitration and mediation.

The strike, however, was called on May seventeenth, and the picketing complained of here began shortly thereafter. The sole question presented by this action is whether the numerous acts shown by the evidence to have accompanied the strike and picketing

are legal or illegal. The grant or refusal of the permanent injunction sought by plaintiffs depends upon the answer to that question. The right to strike and the right to picket has been repeatedly upheld by the courts, and in this day and age requires no discussion. Neither right, however, justifies or excuses acts which are illegal *per se*.

Actions involving labor disputes seldom present such clear cut factual data upon which to base a judicial decision as is disclosed by the proof in this case. Too often there are twilight zones between economic necessity and strict legal rights and between social justice and individual rights presenting a baffling if not insoluble situation for disentanglement. The voluminous proof submitted here conclusively establishes a plethora of acts which clearly protray the atmosphere or setting of this dispute and which focus judicial and public attention upon an important aspect of labor privileges and immunities and their concomitant obligations and responsibilities.

Numerous acts of misconduct were established by the proof, some of which are violative of law and order and distinctly conducive to a breakdown of the public peace. They may be classified as (1) acts of physical and forcible obstruction to the proper and orderly conduct of plaintiffs' business; (2) threats, intimidation and coercion inducing a breach of the public peace and tending to constitute a violation of constitutional rights of others; (3) promulgation of false, deceitful and misleading statements calculated to deceive the public as to the true state of affairs, for which purpose the facilities of the post office were used along with other means; and (4) false propaganda and appeals to class hatreds circulated to build up an *esprit de corps* among the strikers and their sympathizers, based upon unsound social economics tending to cheapen the intelligence of the workers and foment organized opposition to orderly processes and the administration of the law.

In view of the great number of acts complained of and which are established by the proofs, it will suffice for the purposes of this opinion and to keep it within proper bounds to generalize such acts and their effect and influence upon plaintiffs, their employees and customers and the public. Illustrative of the first class of acts above mentioned is the case of a customer who was stopped by two pickets as she was about to enter one of plaintiffs' stores and threatened with physical violence if she went in. The threat had its intended effect and the customer left without entering. A day or two later a prospective customer was stopped by another picket as he was about to enter another store of one of the plaintiffs. The picket referred the intending buyer to a store belonging

to the picket's father and furnished him with a card bearing that store's address. At least two members of the defendant local admitted that during the strike they called at homes of plaintiffs' customers to prevent payment by the latter of installments due to plaintiffs, one of defendant's members actually collecting an installment from one customer and pocketing the money. Another member of the local, accompanied by two other men not identified, entered the home of a female relative of one of plaintiffs' employees and threatened to picket her home and that of the employee if the relative did not compel the employee to leave his job and join the strikers. Many other similar instances were established by satisfactory proof.

While strikers may use any and all peaceful and lawful efforts to induce workers to join their ranks, the evidence shows many instances of threats, intimidation and coercion exceeding legal bounds. A female employee was followed by several members of the local from the store where she was employed to the restaurant where she lunched and there denounced by them as a scab and a strikebreaker and otherwise vilified. Their manner and language was such as to cause her to fear for her physical safety. Another young lady was seized by a negro picket as she was about to enter plaintiffs' store where she was employed. Aided by a co-employee, she gained the safety of the store, but was subjected to a torrent of abusive language from the picket, who applied to her the vilest term known to our language. On another occasion a different member of the defendant local accosted this same employee in vulgar terms and threatened to spit in her face. Other employees were warned by members of the local that they would " get " them.

The third class of acts above specified, namely, false and misleading statements concerning plaintiffs and the controversy, directly involves the public, for it was to the public that such statements were issued. This is the first case that has come to my attention wherein the United States mails were used to disseminate false propaganda relating to labor controversies. On May twenty-seventh of this year every tenant in the apartment house 306 Union avenue, Brooklyn, wherein one of the plaintiffs' employees, Rose Esposito, lived, found in his letter box a circular signed " The Bush Strikers, Members Retail Employees Union Local 830 — U. R. & W. E. A.— C. I. O., United Optical Workers Union — Local 208 C. I. O.," and which among other things contained the statement: " Your neighbor Rose Esposito, 306 Union Street, is a scab at Busch's ! " Similarly the home of Dr. Benjamin Meyerowitz at Long Beach was picketed by members of the defend-

ant local with placards bearing the statement: " Your neighbor Dr. Benjamin Meyerowitz is a scab at Busch's." Dr. Meyerowitz is an employee of one of the plaintiffs.

Other statements, both oral and printed, circulated in the immediate neighborhood of various of plaintiffs' stores, were: " We are locked out. Help us get our jobs back." " Anybody but a louse would not enter this store while the strike is on." " While the strike is on you don't have to make any payments. After the strike is settled even then you don't have to pay them if you are smart." " If you buy a radio you will have to bring it back tomorrow because this is not a reputable company." " Busch's are making prostitutes of their women." " They cheated us they will cheat you too." " Don't make any payments. They will give you phoney receipts." " They sell cracked diamonds." " You won't get credit for the money you pay." " Don't make any payments. They can't do anything to you." " Busch's doesn't hire colored people."

Not only were these false statements exhibited on signs by defendants, but they were uttered in a loud, boisterous tone in sing-song fashion by such defendants while encircling the fronts of plaintiffs' stores. The monotonous repetitions and the encircling process were definite disturbances of the peace, interfering unreasonably with the orderly process of business, and exceeded legal and orderly picketing as usually conducted and as permitted under the laws and decisions of this jurisdiction. Not the least offensive of the many false statements are those found in a handbill circulated in the Harlem section of this city, where the negro population is largely centered, and where plaintiffs operate several stores. It reads: " PEOPLE OF HARLEM: One of the main demands on which we base the settlement of the strike is the employment of fifteen additional negro employees at Union pay and Union hours in all categories at work." No such demand was made by defendants until the latter part of the conferences, more than three weeks after the strike commenced. There is no mention of negro workers in any of the handbills distributed by defendants in other localities. This demand is clearly an afterthought, designed to appeal to racial prejudice, and playing no part in the disagreement resulting in the strike.

Apparently for the purpose of stimulating a mass feeling of unity among the strikers, defendants issued a series of bulletins consisting almost exclusively of statements subversive of order and decency, provocative of boisterous if not illegal conduct and containing statements either wholly or partially false. The dozen

or more of these bulletins put in evidence are too lengthy to even summarize in this opinion, but running through all of them is the same theme of abuse and vilification of plaintiffs and their employees who remain at work, vivid recitals of defiance by pickets of orders issued by police officers, stories of mass picketing and disturbances created by such pickets, and similar stories of the activities of the strikers intended and calculated to incite further disorders and defiance of police officers and civil authority. Equally offensive if not as clearly illegal is the studied effort to inject into this strike a carnival spirit and the complete failure to inculcate the seriousness of a dispute which so directly affects the maintenance of the home and the families of the strikers and the preservation of the rights of workers.

I have hastily summarized some of these various acts of misconduct as alleged, because the nub of this case concerns the legality or illegality of those acts. In the light of all the circumstances disclosed by the factual data characterized in the general language above, it is appropriate to refer to the law applicable to such facts.

It has been decided that where illegal mass picketing takes place, such privilege may be forfeited by the character of the picketing indulged in.

The law is well settled that where, as in the instant case, defendant unions have repeatedly and constantly engaged in unlawful picketing accompanied by disorder, intimidation, loud and boisterous language, the issuance of false and misleading statements, congregation in great numbers in front of plaintiffs' places of business, thereby causing crowds to collect and to block ingress and egress to plaintiffs' stores, and by disorderly, offensive, abusive and insulting remarks to plaintiffs' employees, customers and prospective customers, and that where it appears that upon the facts of the case, as it does in this case, that there is danger of the continuance of such unlawful acts with consequent injury to plaintiffs if any picketing whatsoever is permitted, courts of equity will and have enjoined all picketing.

An early expression of this doctrine appeared in *Exchange Bakery & Restaurant, Inc.*, v. *Rifkin* ([1927] 245 N. Y. 260), when the Court of Appeals stated (at p. 269): " Where unlawful picketing has been continued; where violence and intimidation have been used and where misstatements as to the employers' business have been distributed, a broad injunction prohibiting all picketing may be granted. The course of conduct of the strikers has been such as to indicate the danger of injury to property if any picketing whatever is allowed."

In *Mann* v. *Raimist* ([1931] 255 N. Y. 307) Judge CARDOZO said (at p. 315): " Whether the trial court in view of this record of defiance, would give the defendant still another chance to picket peacefully and in order, was something to be determined in the exercise of a wise discretion. This court may not interfere except for manifest abuse. * * * The injunction is sustained upon the theory that the defendant having been permitted to picket subject to conditions, violated those conditions, and in contempt of the existing mandate picketed with violence and with falsehood, spreading terror with a strong hand and a multitude of people. In the judgment of the trial court ' the [defendant's] course of conduct * * * has been such as to indicate the danger of injury to property if any picketing whatever is allowed.' (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin, supra.*) We cannot say that a basis for that belief is lacking altogether."

An abuse of picketing was sufficient to enjoin all picketing in *Stillwell Theatre, Inc.*, v. *Kaplan* ([1932] 259 N. Y. 405). POUND, Ch. J., cited with approval the *Exchange Bakery* case, *Nann* v. *Raimist* and *Steinkritz Amusement Corp.* v. *Kaplan*, pointing out (at p. 411) that the holding in the latter case had been as follows: " By abuse of picketing, it was held that the Union had forfeited the right to picket."

Further proof of this doctrine is found in *J. H. & S. Theatres* v. *Fay* ([1932] 260 N. Y. 315, at p. 318).

Nor does the enactment of section 876-a, subdivision 1, paragraph (f), clause (5), withdraw from this court its constitutional power to issue such an injunction. That section merely states that no item of relief shall prohibit: " Giving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, any dispute, whether by advertising, speaking, picketing, patrolling any public street or any place where any person or persons may lawfully be, or by any other method not involving fraud, violence or breach of the peace."

The construction of this subdivision has expressly been left open by the Court of Appeals in *Goldfinger* v. *Feintuch* ([1937] 276 N. Y. 281), where the court stated (at p. 288), after first reciting the above quoted subdivision of section 876-a of the Civil Practice Act: " Whether this statute is merely an expression or an extension of the principles of the common law and equity as applied to labor injunctions and stated in the opinions of this court, need not now be considered."

*De Agostina* v. *Holmden* (157 Misc. 819), however, correctly holds that this section is merely declaratory of the law as it existed prior to the passage of section 876-a and that, therefore, an injunction

prohibiting all picketing may be issued where, in the opinion of the trial court, the facts are such as to indicate the danger of continued unlawful picketing and injury to plaintiffs' property if any picketing whatsoever is allowed. In this case the court, after a careful appraisal of the facts, enjoined all picketing of one of the theatres involved, and limited to two the picketing in front of the other theatres.

The construction of subdivision 1, paragraph (f), clause (5) of section 876-a of the Civil Practice Act as merely declaratory of the law is supported by both the express policy and intention of the State Legislature in passing section 876-a and by the necessity of avoiding grave doubts as to the constitutionality of subdivision 1, paragraph (f), clause (5) if any other construction be placed upon it.

The preamble to chapter 477 of the Laws of 1935 (§ 876-a) recites the policy of the State Legislature in enacting section 876-a. It states that equity procedure which permits a complaining party to obtain injunctive relief without an adequate hearing of the responding party, or only after a hearing based upon written affidavits and not upon the examination and cross-examination of witnesses in open court is " peculiarly subject to abuse in labor litigations." The reasons for this conclusion are: (1) that the *status quo* cannot be maintained but is necessarily altered by the injunction; (2) that the determination of the issues of veracity upon affidavits is subject to grave error; (3) that error in issuing injunctive relief is usually irreparable to the opposing party; and (4) that the delay incident to the normal course of appellate procedure frequently makes ultimate correction of error in law or in fact unavailing. It would be unreasonable, in view of this expression of policy by the State Legislature, to assume that the Legislature intended to change any substantive right or to withdraw any part of the equity jurisdiction conferred upon the Supreme Court by article VI, section 1 of the Constitution of the State of New York.

To interpret section 876-a or any subdivision thereof as in any way withdrawing equitable power from the Supreme Court would raise grave doubts as to its constitutionality. This was recognized by Justice SCHMUCK in *Aberdeen Restaurant Corp.* v. *Gottfried* ([1935] 158 Misc. 785). He stated (at p. 788): " The important distinction between Federal equity jurisdiction and that of this court is that the former is statutory, while the latter is constitutional. Naturally, whatever Congress has granted to the court of its own creation, it may control. It, therefore, follows that no constitutional right is infringed by a congressional curtailment of a remedy or a withdrawal of remedial rights from the jurisdiction of the District Court, since the litigant never had any absolute consti-

tutional right to have a Federal court take jurisdiction. Vastly different is the position of the State court. Constitutionally, equity jurisdiction is an inherent element of the State court. *If a litigant is entitled to an equitable remedy and has no adequate legal remedy, a destruction of such right of redress would be a denial of justice, and thus a violation of both State and Federal Constitutions.* In fact, in *Duplex Printing Press Co.* v. *Deering* (254 U. S. 443; 41 S. Ct. 172; 65 L. Ed. 349; 16 A. L. R. 196), the Supreme Court of the United States so held. It there seemed to the court that the State statute practically granted ' complete immunity of any civil or criminal action to the defendant, for it pronounced their acts lawful.' In this matter, however, there is no deprivation of the right to an injunction. *If such was the effect of chapter 477 of Laws of 1935, it unquestionably would be unconstitutional.* Here there is only an effort to limit the circumstances under which an injunction can be obtained."

It has been brought out in this case that the police department leaves to the discretion of each individual precinct captain, the right to determinate in what general form picketing is privileged. Thus the number of pickets, the manner of the picketing itself and the character of the whole program to advise the public of the nature and extent of the strike is reposed within the sound discretion of a police officer.

This court is of the opinion that this discretion must stand sound judicial review and, therefore, be subject to its approval. One test of the exercise of such discretion being sound or not, is to be found in the manner in which sustained picketing continues. Here there is no doubt but that the police officers have acquiesced, unintentionally no doubt, in a course of conduct, illegal, anti-social and fundamentally opposed to the preservation of these plaintiffs' rights.

I find that there has been no adequate police protection in the sense that the judgment used in permitting to continue the type of picketing is violative of law and order, and of the constitutional rights of the plaintiffs and that as conducted such picketing operates to breach the public peace.

On all the facts which are before me, there is presented no question of law, of labor economics or of social philosophy. What is before me is essentially a question of fact and the nature and extension of such facts, demonstrated by the proof submitted, conclusively shows that they would be socially wrong, whether in the field of labor law or in any other phase or branch of our law.

Thus there is offered nothing to this court concerning which it can exercise any discretion. In any court, in any country, and I

may say almost in any language, the acts complained about constitute an infraction against decency, the proprieties of the law and the sacred liberties of the persons threatened and molested.

*For justification against permitting the continuance of such invasion of personal liberty, of freedom and rights of property, one looks for and finds those reasons laid in the constitutional basis of a free government without which this country could not stand.*

It is contended that the right to picket is measured by the sovereign right of the worker to organize and choose the form of its opposition to the employer class, including the choice of forum as well. Measured by the facts, such canards insult the intelligence of the worker and are based on an imperfect conception of democratic principles. The legitimacy of the acts in dispute here are to be measured by their scope and effect apart from their willfulness or unwillfullness.

*Much confusion, and worker-loss besides, results from such intransigent attitudes as would make the conduct of a strike partake of the atmosphere of an Italian fiesta, so gloatingly described in one of the bulletins and is in keeping with their generally boastful tone throughout. The attitude of the strikers and pickets here is a far cry from the slow burning crusading spirit motivating labor's original pioneers.* The carnival spirit with which the bulletins in evidence hoped to conduct a picket and a strike misses by a wide margin that relentless zeal by which the genuine labor leader aims at the accomplishment of bettering the workers' welfare.

I yield to no one in my desire to better the conditions of labor for the working class. I find in them the basic ground or soil within which must grow the strength and stability of all our true democratic institutions. But I would be doing labor a disservice if I permitted it to be interpreted, as here attempted, as a movement justifying its expansion through the nefarious devices employed in this particular dispute.

In labor's forward march and in its growing recognition for the necessity of co-operation between all groups within the social order in order to develop the public weal, there is no room for the use of threats, for strong-arm methods, for deceitful practices, and the abuse of women. These are among the acts included, complained about by the plaintiffs and must be stopped, else we face a condition in which justice is made a travesty. No one seeks this, labor least of all.

On all the facts established, the court is constrained to permanently enjoin the picketing complained of and the defendants, individually and severally, are so enjoined. Injunction granted. Findings passed on. Judgment signed.