Busch Jewelry Co., Inc., and Others, Plaintiffs, *v.* United Retail Employees' Union, Local 830, and Others, Defendants.

Supreme Court, Special Term, New York County, January 13, 1939.

*Scandrett, Tuttle & Chalaire* [*B. Phillip* of counsel], for the plaintiffs.

*Samuel M. Sacher*, for the defendants.

Cotillo, J.   An application has been brought to extend, for a further period of six months, an injunction against the defendants, Local 830 and Local 208 of the C. I. O., which I granted to the petitioners on June 28, 1938 (168 Misc. 224).

The Busch strike, with its many ramifications, has occupied much of my best attention since June of last year.   I have sat on one aspect or other of this litigation during the past summer and also for a time during the recent Christmas vacation.   On a number of occasions I have tried to bring the parties to a settlement of their

dispute through compromise. In some respects it has been a drain on human endurance to keep up with its difficult and varying phases. A multiplicity of suits have occurred in connection therewith. Some of these were distinctly novel; a trial by jury was had on two separate occasions, one such trial involving a violation of the first all-picketing ban issued in this State since the passage of section 876-a of the Civil Practice Act, and the other affecting the conviction of five professional pickets upon similar charges through aiding and abetting in a conspiracy, members of the defendant locals and establishing that the basis of such charges was not a real labor dispute.

The present litigation involves an entirely new aspect of our present labor injunction law, calling as it does this first time for an interpretation of subdivision 8 of section 876-a of the Civil Practice Act.

The June, 1938, anti-picketing injunction brought up not only questions involving breach of the peace, violence, fraud, the instigation of class and race feeling, the use of professional pickets, but it also involved the question of free speech in labor disputes and, more fundamentally, what constitutes lawful and peaceful picketing.

There has been little, if any, let-up on the time and energy required of lawyers, litigants and the court itself. Despite the fact that the Appellate Division has affirmed that original injunction, appeals still continue. The question of the propriety and correctness of the conviction of twelve pickets under that injunction in chief, and under the jury trial had thereby, remains still a subject of future appellate adjudication.

I have in the instant litigation before me caused the taking of the entire evidence in the case on the issues involved. That has required two court days. Time was saved by the introduction into evidence of completed records of prior trials. During this last trial it was testified to and conceded by both sides that the parties to this litigation have themselves conferred repeatedly in an endeavor to find a peaceful solution of their differences. No less than thirty of such conferences have been had since the injunction issued and at such conferences there have sat labor leaders and trusted representatives on both sides.

Since December twenty-ninth, when the original injunction expired under the applicable Civil Practice section, new pickets have appeared, the defendants apparently satisfied that the injunction in chief does no longer forbid them from so doing.

It has also been testified that the president of the Busch stores has a substantial interest in stores located in Buffalo and in Pittsburg; that this litigation has brought into being criminal libel

suits in Pittsburg; that it also has been the generating cause of picketing carried on against those stores; that charges of assault have likewise been preferred in that far-away city; and that here in New York a criminal charge has been brought against one of these defendants and a member of the defendant Local 830, alleging a violation of the Sanitary Code and of our misdemeanor law, and that such trial has been repeatedly postponed pending the outcome of this court's decision in this case.

In this very case I am informed that if I decide adversely to the petitioners they will want to appeal to protect their interests and their property as well. If, on the other hand, I decide against the unions, I am likewise assured that they will see in such decision the imperative necessity for a fight to the finish, because vital social and economic interests are involved.

Thus I am persuaded that the court's mandate or decree of coercion or compulsion will settle nothing; that the bitterness already involved here will increase and not decrease; that victory will be striven for by each side with renewed and even redoubled efforts. Thus does otherwise commendable effort seeking legitimate goals when embittered by emotion, raise no inconsiderable rancor.

It seems a travesty upon justice that we can almost know in advance that my decree can and will settle nothing. And this is the very kind of dispute where differences are least desirable because the injurious effects so far as social and human costs are concerned will be most devastating in their consequences. A continuation of this dispute is deplorable; it is destructive; no good can come of it; everyone whom it touches is hurt by it, including the public.

In the calmness induced by a period of reflection while in my study, I am reinforced in my conviction that in these labor disputes there are too often less legal problems to be solved than social, economic and even political ones. Thus it appears to me that the employment of expert, fact-finding devices rather than judicial acumen can do more to repair the already too great social and economic injury which has been done here.

If we had in this State a specialized labor court, acting in conjunction with our other courts as presently constituted, much of the present difficulty should disappear. But considering our present set-up of courts, any purely legal evaluation of social and economic factors raises dissension and creates disagreement.

By virtue of this conviction, I have decided that this dispute can and should be settled by conciliation and arbitration. Such thought grew out of testimony given at this last trial and is based on the knowledge that the sole difference preventing the harmonious

settlement of this dispute is the question of an open shop, lay-offs and an arbitration clause. Surely a *modus operandi* culminating in a peaceful solution of these not insoluble differences should be possible. To this thought, so expressed by me in open court, both sides have expressed a willingness to give the matter consideration. If such a solution materializes, there would be opened, if not a new, at least a pragmatic adaption of combined judicial and lay common sense.

Our courts in the past have appointed committees to hold elections, in order to determine with what bargaining agency the employer must deal; and to otherwise indulge in fact-finding activities, all operating as essential judicial aids. *But in no case that I know has there been by voluntary act of the court a judicial divesting of authority after a full taking of testimony has taken place.*

In this case I am satisfied that the taxpayers' interests, as well as the litigants', will be best served by just such a procedure; that this dispute in its bare essentials, presents problems predominantly more social and economic than judicial, and finally, that time of the litigants and the court and expense to the taxpayers can be conserved to a maximum degree by removing this litigation from the legal forum and transplanting it to an administrative committee whose task will be to search for a common formula upon which to predicate the creation of a fair contract binding both employer and employee.

We in America are proud of our efficiency and readiness to try new things. Yet have we really proved adept at fashioning tools ofttimes conveniently at hand and which in part have already been tested and found advantageous? Not that everything can be copied with profit from Europe. Yet I believe I am justified in referring to the experience of England with respect to its Trade Disputes Act, and to Sweden with its various collective bargaining acts.

In England, under the Trade Disputes and Trade Unions Act, 1927 (17 & 18 Geo. 5, c. 22), the workers' right to strike is assured, except where the well-being of the community is threatened. Experience there shows a variety of voluntary methods for settling disputes, all operating successfully today. The general practice seems to be to intrust to experienced bodies or committees responsibilities for finding solutions to such questions. *Much of this machinery is unsupported by law enforcement and depends almost entirely on the good will of the participants. The government intervenes only upon invitation and when existing machinery for settlement has been exhausted.*

Of special consideration in this connection are the courts of inquiry established in Great Britain, which are governmental agen-

cies for avoiding friction between employer and employee, and the use of which is entirely voluntary. Legislation passed in 1919 permitted the use of these inquiry bodies which are used sparingly and are authorized by the British Minister of Labor. Since 1919 only twenty-one such boards have been appointed. They usually come into being only when there is a hopeless deadlock plus the apprehension of serious implications, and usually involve a dispute broader or wider than the special interests then being settled.

Whether it be conciliation or arbitration or courts of inquiry which are invoked, England's experience indubitably establishes that the workings of this most significant labor act there functions best under voluntary acceptance and by compromise, and that both sides consider it a tragedy if they are compelled to call in governmental agencies.

In Sweden the most important labor decisions there involve perhaps the right of collective bargaining. Encompassed within three statutes, the first passed in 1906, the second in 1928, and the last in 1936, that country has found it possible to say that " the right of bargaining for one party *includes the duty* of the other to take part in a conference."

By the passing of such law, democratic Sweden made it possible to enforce no labor contract which violates the right of association. That same Swedish law covers the relations between all *employers and employees* excepting State employees. And one party may demand a conference at any time. All that the other may ask is that the demand be put in writing, specifying the questions to be discussed. With that, a time and place of meeting must be agreed upon *without delay* and minutes recorded, if so requested.

This statement of Swedish experience is less important so far as the actual *modus operandi* is concerned, as it is important in furnishing us with a new and separate or additional test of how voluntary associations of employers and employees gradually assume important public functions *without relinquishing principles of competition and freedom of association*. How industrial peace may be had without the expense of subjugation and rendering fighting groups impotent; and finally, how the State has definitely encouraged co-operation leading towards a balance of power within the respective disputants. All this, through the self-enforcement and acceptance between parties themselves of agreements arrived at through limiting potential hostilities within the areas of contract. In my opinion, a labor court devoted to the development of such agreements would secure country-wide approval.

Though our Wagner Act (U. S. Code, tit. 29, §§ 151–166) today constitutionally protects the industrial worker organization, still

this principle remains unacceptable to a considerable group within our society. Absent, too, here is a powerful central employers' federation specifically opposed to one or two powerful labor groups. And conspicuously absent, too, is any equilibrium or balance of power between employer groups and labor groups which means so much for peace today. For this reason we cannot thrust public functions or responsibilities entirely upon the disputants themselves.

In both these illustrations, in my humble opinion, it was found that the efficacy behind the functioning of a harmonious system insuring settlements between labor disputants lay not totally in judicial decree nor injunction potency. That is why basically I am so concerned that the present solution of this litigation must command the co-operation of both sides. The example of success in European settlements results from all of them being definitely based upon the spirit of willingness and desire to compromise and to accept voluntary agreements. So the clear lesson regarding Europe's solutions of her labor problems to us is that the further removed remains government intervention or total judicial fiat, the better off are the economic and financial interests of the respective litigants involved. Summing up the conclusions of the American Commission appointed by President Franklin D. Roosevelt to study and report to him on Industrial Relations in Great Britain, we are there told that the acceptance and general practice of collective bargaining on an industry basis places upon the employers' and workers' organizations, because of the sheer numbers of men and the magnitude of interests involved, a peculiarly heavy responsibility calculated by its very nature to call forth patience, understanding and a desire to make and keep agreements and to achieve industrial peace. In a nutshell, what must be sought is less coercion and compulsion and more of compromise and a voluntary give-and-take. And the measure of compromise specifically varies with the facts of each case. So advanced are such procedures in Sweden, that it is not amiss to say that upon the shoulders of both litigants is placed a considerable degree of responsibility for maintaining peace and for finding and indeed working out a successful formula, conspicuously absent almost everywhere throughout the United States.

Perhaps these animadversions may appear gratuitous in a legal opinion. Yet they are not entirely amiss where, if following a protracted series of involved and novel litigious points, there were finally to come to light upon this storm-beaten citadel, the dove of peace in the form of final agreement to accept the decision of a neutral committee of outstanding citizens.

**860**

Let us apply the experience of nations older and wiser than ours in the handling of employer-employee disputes. Let us bring peace to this situation by the application of reason, not force.

I appeal to the reason and fairness of each of the parties, and suggest and urge that they submit their differences on the question of the open shop, lay-off and arbitration provisions of a contract to a committee of three outstanding citizens.

In order to have such a committee act, it becomes necessary to call a truce in this conflict. Each party is to undertake that there will be no interference with the business or activities of the other, by discrimination of the employer, picketing by the employees, or by any other means, and an undertaking by each that this method of disposing of their differences and the bringing of peace to all is satisfactory to them and that they will be bound by the decision of the committee. I, for my part, will hold up any decision on the pending application until after the committee reports.

I, therefore, appoint three men of learning, ability and experience, who in the past have demonstrated their public spirited and civic minded character: Professor Young B. Smith, dean of the School of Law of Columbia University; Mr. Sidney Hillman, an executive of the Congress of Industrial Organization; and Mr. Percy Magnus, president of the New York City Board of Trade, as such committee, and Mr. John H. Mariano, Ph. D., Columbia, as secretary to the committee to assist in the task of hearing the parties and in the preparation and filing of a report.