SOCIETY OF THE NEW YORK HOSPITAL, Plaintiff, *v.* CHARLES W. HANSON, Individually and as Chairman of New York Building and Construction Trades Council's Maintenance Organization, A. F. of L. et al., Defendants.

Supreme Court, Special Term, New York County, December 18, 1945.

*Rathbone, Perry, Kelley & Drye (F. A. Bensel, Jr.,* and *W. F. Knecht* of counsel), for plaintiff.

*Harold Stern* for defendants.

PECORA, J. The plaintiff, the Society of the New York Hospital, has brought this action for a permanent injunction, enjoining and restraining the defendants, a labor union organization called New York Building and Construction Trades Council's Maintenance Organization, its officers, agents, members, representatives, and those acting in concert with them, from interfering with the operation of plaintiff's hospital by causing, instigating or continuing any strike, work stoppage or action of a similar nature, from picketing in front of or in the vicinity of plaintiff's hospital and from otherwise interfering with the orderly operation of the hospital.

Upon the trial before me, the evidence established the facts hereinafter set forth.

The plaintiff is a public, charitable, nonprofit and nonsectarian corporation engaged in the operation and maintenance of a general hospital in the city for the care and treatment of the sick and injured, and for the advancement, through research and teaching, of preventive and curative medicine.

It is concededly a charitable institution. In the year 1944 it maintained 1,448 beds. Approximately 93% of the patients treated that year paid less than the full cost of their care, and many did not pay any part of that cost. It cared for 8,754 children. It made 264,068 laboratory examinations. Its activities are housed in 15 separate contiguous buildings, varying in height up to 25 stories. Many surgical operations and child deliveries occur daily in the hospital, and emergency cases are brought in constantly and at all hours. Its operating loss was $1,135,441.09, which had to be met through contributions from sources which include the City of New York, the United Hospital Fund and the Greater New York Fund.

The plaintiff employs approximately 2,500 persons in addition to its professional staff. These include employees working in the hospital's power plant, elevator operators and maintenance men such as electricians, mechanics, plumbers, carpenters, painters and upholsterers.

The hospital is wholly dependent upon its power plant operated by its employees, for the electricity required not only to light and heat its premises, but to operate equipment such as oxygen tents, respirators, incubators, sterilizers and many

other modern instruments and machines now recognized as essential to the proper operation of a hospital.

On November 19, 1945, about 116 nonprofessional employees, including power plant workers, elevator operators and maintenance men, failed to report for work following a statement made two days previously by an officer of defendant union to plaintiff's officers, that some workers would not report on that day because conferences between plaintiff and defendants had apparently reached an impasse. These workers have not yet returned to their jobs, and their absence has to a certain extent handicapped plaintiff in the performance of its functions. On that day members of the defendant's union and employees of the plaintiff picketed in front of plaintiff's hospital. The picketing was discontinued late that day, as a result of the issuance and service of a temporary restraining order of this court, and it has not been resumed to this date.

The so-called Little Wagner Act, chapter 443 of the Laws of 1937, as amended (Labor Law, art. 20, §§ 700–716), is of major significance in the consideration of this case. This article of the Labor Law purports to define certain of the rights of labor. It is prefaced (in § 700) by a full and broad statement of legislative fact finding and policy, outlining the economic necessity for employees to possess full freedom of association, actual liberty of contract and a collective bargaining power equal to that of their employers. It states that " the denial by some employers of the right of employees freely to organize and the resultant refusal to accept the procedure of collective bargaining, substantially and adversely affect the interest of employees, other employers, and the public in general." The act is designed to enforce " the public policy of the state to encourage the practice and procedure of collective bargaining, and to protect employees in the exercise of full freedom of association, self-organization and designation of representatives of their own choosing for the purposes of collective bargaining, or other mutual aid and protection, free from the interference, restraint or coercion of their employers." Its provisions create a Labor Relations Board, and define the right of employees to organize and to bargain collectively. It prohibits certain unfair labor practices by employers, and provides for the election by employees of collective bargaining representatives. It empowers the board to take certain action to prevent certain unfair labor practices by employers. The board is vested with certain investigatory powers. In proper cases judicial review is provided. The act specifically repeals inconsistent existing laws.

Section 715 of this article provides: " *Application of article.* The provisions of this article shall not apply to the employees of any employer who concedes to and agrees with the board that such employees are subject to and protected by the provisions of the national labor relations act or the federal railway labor act or to employees of the state or of any political or civil subdivision or other agency thereof, or to employees of charitable, educational or religious associations or corporations."

The issues in this case have been limited and clarified by concessions of the parties. The defendants have conceded, for the purpose of this case, that section 715 of the Labor Law does exempt the plaintiff hospital, as a charitable institution, from the operation of the provisions of article 20. It is also conceded that this case does not involve a " labor dispute " within the meaning of that term as employed in section 876-a of the Civil Practice Act, and that, therefore, that section is not applicable here. It was so held in *Jewish Hospital of Brooklyn* v. *"John Doe "* (252 App. Div. 581). Reasoning that section 876-a of the Civil Practice Act is *in pari materia* with article 20 of the Labor Law, the court there held section 876-a to be inapplicable in the case of a charitable institution, even though section 876-a contains no explicit exception and article 20 of the Labor Law does not directly relate to labor injunctions or to employers' remedies against strikers or pickets.

The plaintiff concedes that its employees have the right to organize for the purpose of collective bargaining, to attempt to bargain collectively with the plaintiff, and to assert and advertise their alleged grievances in any proper manner, not including, however, the picketing of the plaintiff's hospital.

It is also conceded that both the strike and the picketing were entirely peaceful, unaccompanied by violence, misrepresentations, fraud or excesses of any kind. In this connection the record is completely devoid of any evidence of any such practices. The plaintiff asserts that picketing would have the inevitable effect of causing crowds to gather in the immediate vicinity of its hospital, of causing members of wholly unaffected unions, such as truck drivers, to refuse to serve the hospital with the supplies it needs daily in large quantities, and of otherwise interfering with the hospital's orderly operations.

This court, therefore, is called upon to decide whether or not any strike for whatever purpose, involving a stoppage of the essential functions of a hospital which is a charitable institution

should be enjoined; and if so, whether or not picketing, no matter how peaceful, should be permitted.

The plaintiff contends that in excluding from its benefits the employees of charitable, educational or religious associations or corporations, article 20 of the Labor Law sets forth a public policy removing them from the pale of legal protection, and outlaws any strike or strike-supporting activities by such employees.

This raises a very interesting question of statutory interpretation. Obviously the Legislature chose to single out the excepted categories for cogent reasons of public policy. Also excepted from the application of the article are the employees of the State or of any political or civil subdivision or agency thereof. These groups, together with the employees of charitable, educational or religious associations or corporations, are clearly thereby placed in a special situation. They are persons who have chosen to work for the public and for publicly supported and public-serving employers. In many cases their work is so closely connected with the public welfare that any interference with their functions would be intolerable. Indeed in some instances, as in the case of the police, sanitation, fire and water departments, such interference might well constitute criminal conduct.

Whether the effect of article 20 is as broad as the plaintiff claims need not here be decided. There may well be charitable, educational or religious activities in which such interference would constitute a relatively minor or negligible nuisance. Whether such nuisance would be sufficiently serious to warrant an abrogation of rights which have come to be regarded as the due of workers, is not now before this court.

On the other hand, there are some occupations not excluded from the applicability of article 20, in which strikes and strike-supporting activities might be enjoined despite the provisions of article 20. The manner in which this question might arise was recently brought before this court in Kings County. (*Matter of N. Y. State Labor Relations Bd.* v. *McChesney,* 175 Misc. 95, affd. 261 App. Div. 1089.) Holding that article 20 of the Labor Law is fully applicable to a *private* hospital, as distinguished from a charitable one, the court there recognized the problems which might develop in the event of a strike, and said (p. 99): " Respondent paints a picture of conditions which might ensue were labor troubles, with their attendant strikes, picketing, walk-outs and similar situations, to visit a hospital where critically sick persons are confined. Respondent at the same time

admits that even without the statute under consideration its employees would be free to join a union. It follows that the results pictured might ensue in any event, *although subject to injunctive relief from the courts.*" (Italics supplied.)

The courts of Pennsylvania have gone so far as to deny the benefits of the Pennsylvania State Labor Relations Act to employees of charitable hospitals, even though there is no provision in the act excluding them from its applicability. (See *W. Pa. Hospital et al.* v. *Lichliter et al., Aplnt.,* 340 Pa. 382; *Salvation Army Case,* 349 Pa. 105.)

This interpretation, however, was rejected by the United States Court of Appeals for the District of Columbia in *National Labor Rel. Board* v. *Central Disp. & E. Hosp.* (145 F. 2d 852), in which the court refused to follow the reasoning of the Pennsylvania courts and held the National Labor Relations Act applicable to a charitable hospital. The Federal court there approved the principle adopted by the Supreme Courts of Minnesota and Wisconsin, to the effect that charitable hospitals and their nonprofessional employees are subject to State Labor Relations Acts which do not expressly exclude charitable institutions from their provisions.

At common law, well established in this State before the passage of article 20 of the Labor Law, the right to strike was fully recognized as one of the most valuable possessions of labor. Our courts have properly refused to enjoin workers from striking or organizing for the purpose of striking, despite such damage as might incidentally ensue to the property of those affected. In exercising this equitable function, however, the courts have been careful to protect both property and lives from strikes called to achieve improper results or which were violently conducted (*Opera on Tour, Inc.,* v. *Weber,* 170 Misc. 272, affd. 285 N. Y. 348; *Exchange Bakery & Restaurant, Inc.,* v. *Rifkin,* 245 N. Y. 260).

It is the court's duty in each case to determine the purposes and objectives which workers embraced in the categories enumerated in section 715 may lawfully attempt to achieve by striking. In so doing the court must weigh the public interest against that to be served by allowing such workers to obtain fair treatment through the utilization of those economic weapons which are available to them. The right to strike has proven to be of such proper potency to labor in our industrial history that this court would not curtail it in any respect except for the most impelling of reasons. But there are some contravening considerations which can be of even greater importance to the public

interests as a whole. It is difficult to conceive of a public service of greater value than the maintenance of hospitals for the care of the sick and the injured. It is almost impossible to conceive of such hospitals functioning properly if they are subject to interference with their activities by strikes or otherwise. Obviously ministration to the sick cannot be delayed. Surgical operations, as well as the routine care of those requiring medical attention, must be permitted to proceed at all times. The effective strength of medicines and serums must be preserved continuously under scientific conditions. The frantic immediacy which is required for the treatment of emergency cases, cannot be suspended while awaiting the outcome of parleys between the hospital management and its employees over terms of labor. These elements imperatively command that the generally broad right to strike be enjoined or otherwise limited in such cases.

A strike by its employees which injuriously affects the essential functions of a hospital, must therefore be held to be improper and inimical to public interest. The public cannot brook any interference with the activities of an institution on which it relies for the treatment of the sick and hurt. A stoppage of electric current, a delay in deliveries of vital supplies, or any number of readily conceivable difficulties created by a strike might result in loss of life. The necessity of avoiding such tragic consequences to the public clearly outweighs the sound general policy favoring the protection of labor's right to strike. Hence this court explicitly rules that no strike productive of such results can be permitted against a hospital which is supported by the public through voluntary contributions as well as through contributions made by the local government, and which is maintained for the benefit of the entire public, including those who cannot pay either in whole or in part the cost of their care and medical attention. This is consistent with the holding in *Jewish Hospital of Brooklyn* v. " *John Doe* " (252 App. Div. 581, *supra*) in which the Appellate Division enjoined striking and picketing against a charitable hospital. In that case the strike was accompanied by violence and other improper acts, and while it therefore differs somewhat from the case before this court, much of the reasoning there expressed is appropriate here.

An injunction will, therefore, issue permanently restraining the defendants from striking and from organizing for the purpose of striking or inducing others to strike against the plaintiff or the hospital operated by the plaintiff. Such an injunction will not, and cannot, trespass upon the right of the individual to

quit his work, for to give it such effect would be tantamount to giving abhorrent sanction to peonage. It is aimed only at concerted activities to bring about and support a strike.

It now becomes necessary to dispose of the application for injunctive relief against picketing.

It does not follow, merely because the court will enjoin a strike, that peaceful picketing should also be prohibited.

Labor's right to picket has been developed by the courts, following a strong tide of enlightened public opinion. Our Court of Appeals played a prominent part in evolving the doctrine that peaceful picketing is a fundamental right of labor, with which the courts will not interfere even though no strike is in progress (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin,* 245 N. Y. 260, *supra*). In that case the court said, at page 263: "Picketing without a strike is no more unlawful than a strike without picketing. Both are based on a lawful purpose. Resulting injury is incidental and must be endured."

The Supreme Court of the United States has also adopted this doctrine, holding that the right of labor to disseminate information, through the form of picketing, concerning the facts of a labor dispute, is inherent in the constitutional guarantee of freedom of speech. In *Thornhill* v. *Alabama* (310 U. S. 88, 101–102) that court stated this principle in the following language: "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. * * * In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution."

That court also has held, in *A. F. of L.* v. *Swing* (312 U. S. 321) that the Fourteenth Amendment protects peaceful picketing even by a person who is not in the employ of the party picketed, although this rule was subsequently qualified by holding that such picketing is subject to reasonable regulation by the States. (*Carpenters Union* v. *Ritter's Cafe,* 315 U. S. 722.)

In the case at bar the picketing was entirely peaceful and was conducted without violence or misrepresentation. It did, however, accompany a strike which has been widely publicized, and the existence of which is well known to the members of other unions who would have to cross the picket line to enter the hospital for delivering its necessary supplies, and who would

inherently be averse to do so if a strike were in effect. Striking and picketing usually are concomitants in the public mind.

Inasmuch as peaceful picketing has consistently been held by our highest courts to be an exercise of the constitutional right of freedom of speech, this court does not feel that defendants should, at this time at least, be enjoined from picketing, provided, however, that the picketing be done in such form as will not deter persons having business or professional relations with the hospital from crossing the picket line; and provided, further, that such picketing does not otherwise interfere with the hospital's functions. The court will pass upon the proposed manner of picketing in settling the decree to be entered herein. The decree should also contain a provision reserving to the respective parties hereto the right to apply at the foot thereof for its modification to harmonize it with any new facts which may arise.

In granting the motion for an injunction *pendente lite* in this case, the learned Justice at Special Term very properly drew attention to the condition of workers in charitable institutions, saying (185 Misc. 934, 936): "No one denies the right of these employees to better their economic status, but the desired reforms by these certain employees, whatever they may be, must be attained by means which will not tend to impair or even threaten to harm the public health of our citizenry. I am fully aware that these disputes are not entirely one-sided. I also appreciate that if a charitable institution is an outstanding public servant and benefactor, so too is its lowliest employee, whose health also should be preserved and guarded in the first instance by a suitable wage scale. No institution in our form of government should be altruistic, yet niggardly. It might well be that their shining lights of benefaction, mercy and charity, irradiating far and wide, should at least be reflected to the basement of their own structure and their magnanimity extended even to the lowliest within their walls."

With those views I am in hearty accord.

The many thousands of employees of charitable, educational and religious associations and corporations should not be left entirely without legal protection in their efforts to better their economic status by collective bargaining with their employers. The right to bargain collectively alone is of little value to workers unless they have some means of redress in the event that the employer refuses to meet reasonable demands. Article 20 of the Labor Law greatly strengthens the bargaining position of workers and recognizes the need for their protection.

In excluding the employees of charitable, educational and religious associations and corporations from the benefits of that law, the Legislature recognized the essential difference between such employment and employment in private industries operated for monetary gain and profits. It may fairly be said that any employee choosing to work for such an institution must realize that the nature of his employment presupposes certain obligations on his part, and the loss of certain rights which would be his if he worked for a private employer. Nonetheless, it cannot be said that laboring people at all times actually exercise a completely free choice in the selection of employment. For the most part they are forced to take such jobs as are available in order to support themselves and their families. Employees of the State, or of any of its political or civil subdivisions or agencies, have certain advantages such as tenure of employment and pensions, which are not usually possessed by the employees of charitable, religious or educational institutions. Under these circumstances the Legislature might well be willing to consider the desirability of legislation designed specifically to cover the cases of the last-named groups of workers. Whether or not any particular institution is inclined to be niggardly is not important. The vital factor is that the public interest, which the Legislature must have deemed to be served by denying employees of such institutions the fundamental rights which labor, in the face of bitter opposition, has through the years fairly won in its dealings with private employers, may be better served by the enactment of legislation insuring these employees of fair treatment in their relations with their employers, such legislation, for instance, as may provide for minimum wage scales, hours of labor and arbitration boards to determine disputes.

The defendants in this case would do well to devote a portion of their energies to presenting these matters to the Legislature's attention. This court is hopeful that our Legislature, which has made the eloquent proclamation of the rights of labor embodied in article 20 of the Labor Law, will give adequate heed to the plight in which the employees of charitable, educational and religious organizations presently find themselves because of their exclusion, under the provisions of section 715, from the benefits of that article.

Settle decree in accordance herewith.