James S. Brown, J.
This is an action for a permanent injunction brought by a charitable hospital against a union and others who for several months prior to the institution of this action had been endeavoring to organize the nonprofessional employees of the hospital.
The complaint dated September 11, 1959 alleges that on that day the union had for one and a quarter hours picketed the hospital “for purposes of inducing and coercing plaintiff’s employees to strike ’ ’ and thus require plaintiff to recognize the union as the employees’ bargaining agent.
It further alleges that since it is a charitable institution the law does not require it to recognize any union because such an institution by Federal and State law is expressly exempt from collective bargaining, and that any “ strike, work stoppage demonstrations and picketing will cause plaintiff irreparable and immediate damage and sorely disrupt and disorganize the operation” of the hospital to the detriment of the lives and health of its patients.
The union’s answer expressly denies that the hospital is not a ‘ ‘ trade, craft or occupation, ’ ’ as plaintiff alleged, and admits the picketing and passing out of leaflets in front of the hospital on September 11, 1959. It also affirmatively alleges that the working conditions of the hospital employees ‘ ‘ were and are very poor, inferior and unfair ” and therefore the union had the right to organize plaintiff’s employees and to picket the hospital to publicize its grievances and those of the employees, that a labor dispute does exist under section 876-a of the Civil Practice Act and that the complaint is therefore insufficient.
A previous motion to dismiss the complaint for insufficiency has already been denied by another Justice of this court.
The evidence submitted by plaintiff establishes that it has maintained this hospital as a charitable, nonsectarian institution since 1871 and depends on charitable contributions to offset its annual deficits, and that in 1958 it provided 50,000 days of hospital care, gave 13,000 treatments in its outpatient depart *764 ment, provided the facilities for some 3,300 surgical operations and processed almost 128,000 laboratory examinations.
The hospital’s witnesses consisted of two of its attorneys who witnessed the demonstration on September 11,1959 while attend- • ing a trustees’ meeting at the hospital, its administrator, the superintendent of the housekeeping and laundry departments, and the chef.
The circulars dated September 11, 1959, distributed by the pickets to passers-by and to hospital employees, stated that the hospital “ had been riding rough-shod over their workers,” that ‘ ‘ every insult, every indignity imaginable has been inflicted on these workers,” that the hospital “ is paying their workers wages as low as $28 a week,” that “ the American work week- — • five days, forty hours —is still a stranger ” there, that “ almost daily workers are being fired without a hearing and very often without, a reason,” that the hospital “has brazenly interfered with their workers’ rights to organize and belong to a union,” etc. These various witnesses for the hospital categorically denied each and every one of these accusations and stated that the 40-hour week, with a $1 an hour minimum salary, had been put into effect in the various departments of the hospital earlier in 1959.
The evidence submitted by defendants fail to establish any basis whatsoever for these accusations. The union president, its assistant division director, its Brooklyn organizer and a member of the picket line on September 11, who is an employee of the Jewish Hospital, all gave hearsay testimony that they had “ heard ” such complaints from workers of the hospital. Five employees, were named by these defendants as those who had been discharged without reason except for union activities. Only one of those five workers, a porter, was called to testify and he frankly admitted, that he did not know that he had been discharged for union activities and had not been so advised. He said he did not tell the union organizer he had been discharged for any such reason. He admitted that none of his superiors at the hospital even knew he had joined the union. He said that he merely suspected that was the reason for his discharge because he knew of no other reason. He also testified he would have gladly continued to work for the hospital and had no complaints. The superintendent of the housekeeping department, his superior, testified that after she had reprimanded him several times for soldiering on his job and for showing up for work with liquor on his breath and for taking naps in the locker room while he was on duty, he finally got tired of her continuous call-downs, told her so and then quit. She also stated she had no idea that he was a union member and did not care if he was.
*765 The superiors of the other four employees explained why two retired voluntarily and why the other two were discharged. All of this had no connection with any union activities. These witnesses also testified that they did not have the slightest interest in whether or not any of the employees were members of the union. None of this testimony was controverted and the court has no reason to disbelieve such testimony.
The union does not dispute that it had been trying to organize the employees for several months and that before the incident of September 11 circulars had been distributed urging employees to attend union meetings. One circular dated June 30, 1959, addressed “ To all employees of Prospect Heights Hospital ”, stated: “At this meeting you will also elect representatives to deal with grievances in your behalf with hospital management.” Another circular, dated August 11, 1959 and similarly addressed, states: “What the Union gains for you don’t let anyone cheat you out of. Come to the meeting and learn what the next step is.” A telegram received by the hospital on August 28 stated: ‘ ‘ Request immediate conference to discuss reinstatement of four workers fired for union activities. Since your hospital does not conform to the statement of policy and since you have refused to submit this matter to arbitration, we will be free to take whatever action we feel necessary to protect the right of these workers to join a union of their own choosing.”
The afore-mentioned circular dated September 11,1959 stated at the end: “ Our patience is at an end. Management must act quickly. We are anxious to avoid a fight but the next step is up to them.”
An issue of the union’s newspaper dated September 17, which the union representatives admit was prepared for printing several days before that date, carried an article headlined 1 ‘ STRIKE LOOMS IN BROOKLYN AT PROSPECT HEIGHTS HOSPITAL ’ ’, the first sentence of which reads, “ Strike at Prospect Heights Hospital in Brooklyn looms as a strong possibility as the result of sweatshop conditions and brutal firing of workers which the management refuses to correct.”
In addition, it was common knowledge that in May and June of 1959 this union had struck several hospitals in the city, including one in Brooklyn for a period of 46 days. Nevertheless, the union maintains that no strike was threatened. The court is convinced that the union was threatening a strike and that a strike would interfere with the normal operation of the hospital to the very serious detriment of the sick and injured. As was said by Mr. Justice Pecora in Society of New York Hosp. v. *766 Hanson, (185 Misc. 937, 943, affd. 272 App. Div. 998 [1947]): “ It is difficult to conceive of a public service of greater value than the maintenance of hospitals for the care of the sick and injured. It is almost impossible to conceive of such hospitals functioning properly if they are subject to interference with their activities by strikes or otherwise. Obviously ministration to the sick cannot be delayed. * * * The frantic immediacy which is required for the treatment of emergency cases, cannot be suspended while awaiting the outcome of parleys between the hospital management and its employees over terms of labor.”
The union’s contention that this action was prematurely brought, in that at the time the papers were being drawn the picketing had only gone on for an hour and a quarter, is not well taken. Since the picketing alerted plaintiff to the possibility of a strike, the prompt institution of this action may well have averted tragic consequences.
The hospital argues rightfully that since it is a charitable corporation section 715 of the State Labor Law expressly exempts it from the obligation of participating in collective bargaining.
Section 876-a of the Civil Practice Act does not apply to plaintiff since a charitable corporation such as a hospital is not engaged in any ‘ ‘ industry, trade, craft or occupation” within the purview of paragraph (b) of subdivision 10 of said section. (Jewish Hosp. of Brooklyn v. Doe, 252 App. Div. 581.)
The fact remains, however, that the courts in granting injunctions to charitable organizations have nevertheless invariably permitted peaceful picketing which would not “ deter persons having business or professional relations with plaintiff from crossing the picket lines ” (American Soc. for Prevention of Cruelty to Animals v. Geiger, 208 Misc. 29, 31; Beth-El Hosp. v. Robbins, 186 Misc. 506; Society of New York Hosp. v. Hanson, 185 Misc. 937, supra).
The court therefore grants judgment to the plaintiff for the permanent injunction prayed for, except that defendant union may resume its picketing activities provided they are peaceful and do not interfere with the normal functioning of the plaintiff hospital and the normal service to its patients. The court will pass upon the proposed manner of picketing in settling the judgment to be entered hereon. The judgment shall contain a provision reserving to the parties the right to apply at the foot thereof for modification required by any new facts which may arise.