Chief Judge Fuld.
Several years ago, the court held that participation by employees in a .strike in violation of a “ no-strike ” clause contained in their collective bargaining agreement with their employer did not constitute misconduct within the meaning of subdivision 3 of section 593 of the Unemployment Insurance Law (Labor Law, art. 18) so as to deprive them of unemployment insurance benefits. (Matter of Heitzenrater [Hooker Chem. Corp.], 19 N Y 2d 1.) This appeal, here by our leave, *580 calls upon us to decide whether the same result follows where employees engage in a strike or work stoppage which has been declared “unlawful” by statute (Labor Law, § 713). In our view, it does not.
The facts are quickly told. The employer, appellant Presbyterian Hospital, is a voluntary non-profitmaking hospital. The claimant-respondent, Felix Rodriguez, was employed as. a worker in the hospital’s food service department for some five months. About 12 o’clock on January 9, 1971, when the noonday meal was being prepared and served to hospital patients, the claimant and other workers on duty in the hospital’s main kitchen participated in a mass work stoppage to protest the disciplinary action taken against two other employees. Although most of the workers returned to their jobs shortly after the stoppage began, Rodriguez and more than 20 others continued to refuse to work. Rodriguez also refused, despite orders from hospital officials, to leave the premises and, indeed, he did not depart until approximately 7:00 p.m. The hospital thereupon discharged him and a number of other participants in the work stoppage.
Rodriguez filed a claim for unemployment insurance benefits and was found eligible. The hospital objected and, on its application, a hearing was conducted before a referee. Although he found that the claimant engaged in “ a mass work stoppage ”, he concluded that it ‘ ‘ must be considered an industrial controversy accordingly, he overruled the employer’s objection and held that the claimant was entitled to unemployment benefits. The Unemployment Insurance Appeal Board affirmed that decision—citing the Heitzenrater case (19 N Y 2d 1, supra)—the Appellate Division unanimously affirmed the board’s determination (39 A D 2d 1015) and, as noted, the appeal is before us by our permission.
It has long been the policy of the courts of this State to prohibit and enjoin concerted activities such as strikes, work stoppages and picketing directed against non-profitmaking hospitals. (See, e.g., Jewish Hosp. of Brooklyn v. “ John Doe", 252 App. Div. 581; Beth-El Hosp. v. Davis, 34 Misc 2d 1045; Society of N. Y. Hosp. v. Hanson, 185 Misc. 937.) Recognizing this long-standing policy, the Legislature, when it enlarged the coverage of the New York State Labor Relations Act in 1963 to include employees of non-profitmaking hospitals and residen *581 tial care centers (L. 1963, ch. 515, § 4, amdg. Labor Law, § 715, sübd. [3]), it also amended section 713 of that statute (Labor Law, § 713) to expressly confirm the prohibition against all forms of strikes and work stoppages at such hospitals (L. 1963, ch. 515, § 3). After reciting that “ [n] othing in this article shall be construed * * * to interfere with, impede or diminish in any way the right of employees to strike or engage in other lawful, concerted activities,” section 713, as amended, goes on to provide, in part, that
“ it shall continue to be unlawful for the employees of a non-profitmaking hospital or residential care center, or their representatives, or any other persons to engage in or to induce or encourage, or to attempt to engage in or to induce or encourage any strike, work stoppage, slowdown or withholding of goods or services by such employees or other persons at such hospital or residential care center ’ ’.
The primary purpose of the court-developed policy thus codified was to protect the public, and particularly hospital patients, from the potentially disastrous consequences of such activity. It is noteworthy that the Legislature did not merely prohibit work stoppages; it also established alternative peaceful methods for resolving those disputes—for instance, by compulsory arbitration (Labor Law, § 716; see, also, Labor Law, §§ 703-706) — and, by so doing, removed the only justification for the conduct proscribed.
Since the claimant participated in a work stopage which was expressly and absolutely prohibited by section 713, it follows that — in contradistinction to the situation in the Heitzenrater case (19 N Y 2d 1, supra) —he engaged in legislatively defined ‘ ‘ misconduct in connection with his employment ’ ’ (Labor Law, § 593, subd. 3). In Heitsenrater, we decided that mere participation in a strike in violation of a no-strike clause in a private collective bargaining agreement did not constitute such “misconduct ”, within the sense of section 593 as to deprive employees of unemployment insurance benefits, primarily because, to hold otherwise, would have required those administering the Unemployment Insurance Law—the Division of Employment — to resolve complicated issues of labor relations properly reserved *582 to other agencies. Thus, in the course of our opinion in that case (19 N Y 2d, at p. 7), we declared:
‘ ‘ Actually, ‘ fault ’ or ‘ misconduct ’ is not a meaningful concept to apply to a work stoppage which results when the parties, in negotiating a collective bargaining agreement, cannot reach an understanding as to wages, hours or working conditions. If there by any * fault ’, it is often attributable to both parties. Furthermore, even in those disputes which are precipitated by the apparent breach of an existing agreement, the determination of fault or misconduct involves questions of labor relations that are frequently complicated and recondite. It would have been decidedly unwise to vest in officials of a social welfare agency—like those administering the Unemployment Insurance Law—the power to decide such matters. They are best left to agencies especially qualified to deal with them ”.
In cases such as the one before us, however, the absolute nature of the prohibition insures that no ‘ ‘ complicated ” or “ recondite ” questions of labor relations law can arise. The simple fact is that the Legislature itself resolved all such issues by explicitly proscribing and expressly stamping as unlawful strikes and work stoppages by employees of non-profitmaking hospitals or, for that matter, by public employees (Civil Service Law [Taylor Law], § 210, subd. 1). It would constitute a strange rule of statutory construction to hold that one provision of the Labor Law should be interpreted to require payment of benefits to an individual who has been discharged for engaging in conduct in indisputable violation of another, and later enacted, provision of that same statute. (See, e.g., East End Trust Co. v. Otten, 255 N. Y. 283, 286-287; Gwynne v. Board of Educ., 259 N. Y. 191, 197.)
The fact and legal issues in this case are clear and uncomplicated, and the statutory scheme, far from requiring a policy of ‘ ‘ governmental neutrality ’ ’ between contending private parties (Matter of Heitzenrater [Hooker Chem. Corp.], 19 N Y 2d 1,7, supra) Matter of Ferrara [Catherwood], 10 N Y 2d 1, 8), commits the State to an active role in prohibiting a threatened injury to the public interest when the conduct engaged in has *583 been expressly declared ‘ ‘ unlawful ’ ’ by the Legislature. A basic public policy of the State—the prevention of disruption of essential services—would be defeated and violated were we here to sanction the payment of unemployment benefits.
The order appealed from should be reversed, without costs, the determination of the Unemployment Insurance Appeals Board in favor of the claimant annulled and the employer’s objection to the claimant’s eligibility for unemployment benefits sustained.
Judges Burke, Bbeitel, Jasen, Gabrielli, Jones and Waohtler concur.
Order reversed, etc.